COMMONWEALTH vs. ROBERT E. O'NEAL.

Suffolk. June 9, 1975. — December 22, 1975.

Present: TAURO, C.J., REARDON, QUIRICO, BRAUCHER, HENNESSEY, KAPLAN,
& WILKINS, JJ.

*Homicide. Rape. Constitutional Law,* Cruel and unusual punish-
ment, Due process of law.

The mandatory death penalty provided by G. L. c. 265, § 2, for
murder committed in the course of rape or attempted rape violates
the Massachusetts Declaration of Rights. [243]

INDICTMENTS found and returned in the Superior Court
on June 14, 1972.

The cases were tried before *Dimond, J.*

*William P. Homans, Jr.,* for the defendant.

*D. Lloyd Macdonald,* Assistant District Attorney, for
the Commonwealth.

*Raymond H. Young, Edward J. Barshak, Robert
Haydock, Jr., Manuel Katz, Robert P. Moncreiff,* &

*Terry P. Segal,* for the Boston Bar Association, amicus curiae, submitted a brief.

*Malvine Nathanson* for the Massachusetts Defenders Committee, amicus curiae, submitted a brief.

*Laurence H. Tribe & John Reinstein* for the Civil Liberties Union of Massachusetts, amicus curiae, submitted a brief.

*Lawrence D. Shubow, Clyde D. Bergstresser, Morris S. Shubow, & Jeremy A. Stahlin* for the Massachusetts Council for the Abolition of the Death Penalty & another, amici curiae, submitted a brief.

*Joseph P. Busch, Preston Trimble, Patrick F. Healy, Harry B. Sondheim, Arnold T. Guminski, & Daniel L. Bershin,* all of California, for the National District Attorneys Association, amicus curiae, submitted a brief.

*Paul Raymond Stone* of Charlestown, West Virginia, amicus curiae, submitted a brief.

BY THE COURT.    Pursuant to our order in *Commonwealth* v. *O'Neal,* 367 Mass. 440, 450 (1975), the parties and amici have presented arguments as to whether the State has a compelling interest in retention of the death penalty.    We now address the issue whether the mandatory death penalty for murder committed in the course of rape or attempted rape, G. L. c. 265, § 2, is constitutional.    For the reasons stated in the concurring opinions which follow, we hold that the mandatory death penalty for murder committed in the course of rape or attempted rape violates the Massachusetts Declaration of Rights and is unconstitutional.    Accordingly, the judgment on the murder indictment, in so far as it imposes the death sentence, is reversed, and the case is remanded to the Superior Court where the defendant is to be resentenced to imprisonment for life.    See *Commonwealth* v. *LeBlanc,* 364 Mass. 1, 14-15 (1973); *Commonwealth* v. *Cassesso,* 368 Mass. 124 (1975).    The other judgments appealed from are affirmed.

*So ordered.*

Chief Justice Tauro and Justices Hennessey, Wilkins and Kaplan concur in the order of the court. Justice Braucher concurs in the result only. Justices Reardon and Quirico dissent.

TAURO, C.J. (concurring). This case is before us again after further briefing and argument by the parties and amici on the question whether the mandatory death sentence for murder committed in the course of rape or attempted rape is constitutional. A majority of the court hold that it is not.

The facts are set out in our earlier opinion. *Commonwealth* v. *O'Neal*, 367 Mass. 440, 441-442 (1975) (*O'Neal I.*). Briefly, the defendant was convicted of murder committed in the course of rape and was sentenced to death. In his appeal, he challenged both his conviction and his sentence. We affirmed the judgment of conviction in *O'Neal I*, and I limit my discussion here to the validity of the sentence imposed.

1. In determining whether the mandatory death penalty is constitutional in this context, I divide my analysis into two mutually supportive and interlocking parts: one relying on due process concepts derived from arts. 1, 10 and 12 of the Massachusetts Declaration of Rights, the other on the "cruel or unusual punishments" clause of art. 26 of the Massachusetts Declaration of Rights.[1] This dual analysis is possible here where these two concepts are "so close as to merge" because the "due process argument reiterates what is essentially the primary purpose of the Cruel and Unusual Punishments Clause

---

[1] Although I base my decision here on the Constitution of the Commonwealth, I have relied to some extent on cases construing the United States Constitution. I believe that analysis of the issues raised in this case under our State Constitution bears strong resemblance to the analysis under the Federal Constitution. See *Pugliese* v. *Commonwealth*, 335 Mass. 471, 475 (1957). However, I need not reach the Federal constitutional questions in light of the result I reach under arts. 1, 10, 12 and 26.

. . . — *i.e.*, punishment may not be more severe than is necessary to serve the legitimate interests of the State." *Furman* v. *Georgia*, 408 U.S. 238, 359-360, fn.141 (1972) (Marshall, J., concurring).

A. *Due Process.*

In order to be sustained against a due process challenge, a statute affecting fundamental rights must be shown to serve a compelling governmental interest. *Commonwealth* v. *Henry's Drywall Co. Inc.* 366 Mass. 539, 541-542 (1974). *Selectmen of Framingham* v. *Civil Serv. Commn.* 366 Mass. 547, 555 (1974). Cf. *Roe* v. *Wade*, 410 U.S. 113, 155 (1973). "The key words [*necessary* to promote a *compelling* governmental interest] emphasize a matter of degree: that a heavy burden of justification is on the State, and that the statute will be closely scrutinized in light of its asserted purposes." *Dunn* v. *Blumstein*, 405 U.S. 330, 342-343 (1972). See *Opinion of the Justices*, 363 Mass. 909, 916-917 (1973). Additionally, it must be shown that the statutory scheme is the least onerous means of reaching the compelling goal. *Roe* v. *Wade*, *supra*. "Thus, if there is an alternative means by which the State can fulfil its purpose, having less adverse effects on fundamental constitutional rights, the State is required to use the less restrictive, more precisely adapted means." *Commonwealth* v. *O'Neal*, 367 Mass. 440, 448 (1975), citing *Fiorentino* v. *Probate Court*, 365 Mass. 13, 19-20 (1974).

There is little doubt that life is a fundamental right "explicitly or implicitly guaranteed by the Constitution." *San Antonio Independent Sch. Dist.* v. *Rodriguez*, 411 U.S. 1, 33-34 (1973). I stated in *Commonwealth* v. *O'Neal*, *supra* at 449, that the "'. . . right to live . . . is the natural right of every man'" (quoting from Camus, Reflections on the Guillotine, in Resistance, Rebellion and Death, 131, 221 [1969]), encompassing as it does "the right to have rights." *Trop* v. *Dulles*, 356 U.S. 86, 102 (1958). See Comment, the Death Penalty Cases, 56

Cal. L. Rev. 1268, 1354 (1968). Life is "the greatest of all goods," Beccaria, On Crimes and Punishments, 45 (Trans. ed. 1963), and I believe that capital punishment, which involves the extinction of life, the most fundamental of all rights, "triggers strict scrutiny under the compelling State interest and least restrictive means test.[2] Thus, in order for the State to allow the taking of life by legislative mandate it must demonstrate that such action is the least restrictive means toward furtherance of a compelling governmental end" (footnote added). *Commonwealth* v. *O'Neal, supra* at 449-450.

## B. *Cruel or Unusual Punishment.*[3]

The compelling State interest analysis noted above is equally relevant under art. 26. The words "cruel or

---

[2] I do not share the concern of Mr. Chief Justice Burger that placing the burden on the State to justify the death penalty would open the floodgates to constitutional attacks on any punishment that might be imposed. *Furman* v. *Georgia,* 408 U.S. 238, 395-396 (1972). The selection of death as a punishment is a choice entirely different in kind from any other. A person less severely sentenced retains a substantial set of basic rights, see, e.g., *Procunier* v. *Martinez,* 416 U.S. 396 (1974); *Barnett* v. *Rodgers,* 410 F.2d 995 (D.C. Cir. 1968); *Runnels* v. *Rosendale,* 499 F.2d 733 (9th Cir. 1974); one who dies at the hands of the State retains nothing. Courts have consistently allowed a closer and more careful scrutiny where absolute deprivations are involved. See *San Antonio Independent Sch. Dist.* v. *Rodriguez,* 411 U.S. 1 (1973). Compare *Boddie* v. *Connecticut,* 401 U.S. 371 (1971), with *Sosna* v. *Iowa,* 419 U.S. 393, 410 (1975). Thus, the compelling State interest and least restrictive means analysis is particularly congruent with the absolute and irreversible deprivation resulting from a mandatory death penalty, whereas the less absolute features of routine punishments do not demand, and will not be given, such exacting scrutiny.

[3] Notwithstanding the fact that, in *O'Neal I,* I deemed the vast literature concerning cruel and unusual punishment to be a morass which I preferred not to enter, other considerations persuade me that I should address the question of the constitutional validity of the death penalty for rape-murder under art. 26. If this case were to be decided solely on due process grounds, it would resolve no question as to the constitutionality of capital punishment under the cruel or unusual test. In the future, if this course is not followed, a defendant

unusual" are words of art, and, as such, they do not have the same significance they would have in everyday parlance. Their meaning in a constitutional sense must be determined by this court.[4]

Of necessity, every punishment contains an element of cruelty. The convicted defendant who is deprived of freedom or property will feel that society's exactions bind him cruelly. However, society tolerates a degree of cruelty when such cruelty is necessary to serve its legitimate needs.[5] It is only where the level of cruelty is disproportionate to the magnitude of the crime, and as a

---

who has unsuccessfully challenged a capital punishment statute under the due process analysis proposed in *O'Neal I* could still seek to avail himself of the benefits of art. 26. I consider it advantageous to clarify the relationship between these two lines of analysis so as to provide guidance for prospective appeals, and, in view of the similarity of these analyses, I deem it most expedient to do so while this case is before us. It should also be noted that a majority of the court are of opinion that we should address this issue.

[4] I examine the punishment in question here to determine its constitutionality "without regard to any subtleties of meaning that might be latent in the word 'unusual.'" *Trop* v. *Dulles,* 356 U.S. 86, ·100, fn. 32 (1958). I do not believe that the word "unusual" has any qualitative meaning different from the word "cruel" in the context of this case. See The Death Penalty Cases, 56 Cal. L. Rev. 1268, 1345 (1968). This is particularly true under our State Constitution, where the words are used disjunctively. While we have never expressly decided whether the words were meant to be read in the disjunctive, see *Storti* v. *Commonwealth,* 178 Mass. 549, 553 (1901), and, while we have used the conjunctive and disjunctive form of the phrase interchangeably on occasion, *Commonwealth* v. *Moore,* 359 Mass. 509, 515 (1971); *Commonwealth* v. *Morrow,* 363 Mass. 601, 610-611 (1973), I believe that for purposes of this case "any nice argument upon the words of the article" is unnecessary. *Storti* v. *Commonwealth, supra* at 553.

[5] It is noteworthy that one commentator has stated: "Cruelty is properly definable as 'the infliction of pain or loss *without necessity'*" (emphasis added). Gottlieb, Is the Death Penalty Unconstitutional? in Bedau, The Death Penalty in America 194, 201-202 (rev. ed. 1967), quoting from Webster's New Intl. Dictionary 636 (unabridged 2d ed. 1954). Accord, Gottlieb, Capital Punishment, 15 Crime and Delinquency 1, 11 (1969).

consequence does not serve the needs of society, that a
court will find the punishment to be too cruel and, thus,
"cruel" within the meaning of art. 26.[6]   See *McDonald*
v. *Commonwealth*, 173 Mass. 322, 328 (1899); *Common-
wealth* v. *Moore*, 359 Mass. 509, 515 (1971); *Common-
wealth* v. *Morrow*, 363 Mass. 601, 610-611 (1973).   See
also *Weems* v. *United States*, 217 U.S. 349, 368, 381
(1910);[7] *Robinson* v. *California*, 370 U.S. 660, 666-667
(1962).

In ordinary circumstances, the Legislature is given
broad discretion to determine what the appropriate
punishment is for a given offense.   *Harding* v. *Common-
wealth*, 283 Mass. 369, 374-375 (1933).   *Commonwealth*
v. *Morrow, supra*.   See *Robinson* v. *California, supra*,
at 665.   Where restraints on liberty or fines are involved,
a heavy burden is on the sentenced defendant to establish
that the punishment is disproportionate to the offense for
which he was convicted.   If he fails to demonstrate such
disproportion, the punishment will not be characterized
as cruel in a constitutional sense.

---

[6] Certain punishments such as crucifixion, torture and burning at
the stake were among the exactions which constitutional amendments
regarding cruel and unusual punishment were meant to abolish.
They are unconstitutionally cruel in and of themselves, apart from
considerations in relation to the nature of the offense.   See *In re
Kemmler*, 136 U.S. 436, 446 (1890); *Furman* v. *Georgia*, 408 U.S.
238, 264-265 (1972) (Brennan, J., concurring).   The death penalty
itself has not been considered among these, as evidenced by specific
mention of capital crimes in the Massachusetts Declaration of Rights,
art. 12.   See *Furman, supra* at 283 (Brennan, J., concurring).

[7] Although it could be argued with some logic that, given the history
of capital punishment and the barbarous means sometimes employed
in England and elsewhere, the cruel and unusual clause concerned
the manner of the execution and not the punishment of death per se,
recent cases under the cruel and unusual punishment clause reflect a
departure from that view.   Former Supreme Court Justice Goldberg
viewed the *Weems* case as the "turning point in the interpretation
and application of the . . . clause" because it "clearly recognized that
not only the *mode* of inflicting punishment but also the *extent* or
severity of punishment is subject to scrutiny under the eighth amend-
ment."   Goldberg, The Death Penalty and The Supreme Court, 15
Ariz. L. Rev. 355, 359 (1973).

Capital punishment, involving as it does the taking of life, is qualitatively different from other punishments. See *Furman* v. *Georgia,* 408 U.S. 238, 287 (1972) (Brennan, J., concurring). "The penalty of death differs from all other forms of criminal punishment, not in degree but in kind." *Furman* v. *Georgia, supra* at 306 (Stewart, J., concurring). "[I]n assessing the cruelty of capital punishment . . . we are not concerned only with the 'mere extinguishment of life' . . . (*In re Kemmler* (1890) 136 U.S. 436, 447) . . . but with the total impact of capital punishment, from the pronouncement of the judgment of death through the execution itself, both on the individual and on the society which sanctions its use."[8] *People* v. *Anderson,* 6 Cal. 3d 628, 646, cert. den. sub nom. *California* v. *Anderson,* 406 U.S. 958 (1972).

While the actual physical and psychological pain of execution itself is, of course, immeasurable, there is a sharp conflict of expert opinion regarding whether electrocution produces instantaneous loss of consciousness. At least one observer, a French scientist, concluded: "I do not believe that anyone killed by electrocution dies instantly, no matter how weak the subject may be." Comment, The Death Penalty Cases, 56 Cal. L. Rev. 1268, 1339 (1968), quoting Prof. L. G. V. Rota in Scott, The History of Capital Punishment 219 (1950). "Although our information is, not conclusive, it appears that there is no method available that guarantees an immediate and painless death." *Furman* v. *Georgia, supra* at 287 (Brennan, J., concurring).

The convicted felon suffers extreme anguish in anticipation of the extinction of his existence.[9] "The tremen-

---

[8] Capital punishment is "[a]n anachronism too discordant to be suffered, mocking with grim reproach to all our clamorous professions of the sanctity of life." Benjamin Cardozo, quoted in Dictionary of Quotable Definitions 65 (Brussel ed. 1970).

[9] In the instant case, the defendant has been incarcerated under sentence of death since February 28, 1973.

dous mental strain in inexorably approaching a fore-ordained death is unique to the condemned man." Note, Mental Suffering under Sentence of Death: A Cruel and Unusual Punishment, 57 Iowa L. Rev. 814, 830 (1972). Studies describe confinement under sentence of death as exquisite psychological torture, wherein many inmates suffer obvious deterioration and severe personality distortions, including denial of reality. See Gottlieb, Is the Death Penalty Unconstitutional? in Bedau, The Death Penalty in America 194, 201 (rev. ed. 1967); Chessman, Trial by Ordeal 185-194 (1955). See also Bluestone and McGahee, Reaction to Extreme Stress: Impending Death by Execution 119 Am. J. of Psychiatry 393 (1962); *Solesbee* v. *Balkcom*, 339 U.S. 9, 14 (1950) (Frankfurter, J., dissenting).

In order to uphold the constitutionality of punishment which inflicts such suffering and absolutely extinguishes all rights, the State must advance a substantial justification to demonstrate that the penalty of death is not disproportionate or unnecessary and is not, thus, cruel in a constitutional sense. See *People* v. *Anderson*, 6 Cal. 3d 628, cert. den. sub nom. *California* v. *Anderson*, 406 U.S. 958 (1972). See also *Rudolph* v. *Alabama*, 375 U.S. 889, 891 (1963) (Goldberg, J., dissenting); *Furman* v. *Georgia, supra* at 331-332 (Marshall, J., concurring). I believe that the required showing is that of a compelling State interest.[10]

---

[10] This analysis is not foreclosed by previous decisions of this court interpreting art. 26. While *Storti* v. *Commonwealth*, 178 Mass. 549 (1901), assumed that the death penalty was constitutional, "[p]ast assumptions . . . are not sufficient to limit the scope of our examination of this punishment today." *Furman* v. *Georgia, supra* at 285 (Brennan, J., concurring). Furthermore, we are not constrained by that decision because art. 26, like the Eighth Amendment to the United States Constitution, must be interpreted progressively, *Weems* v. *United States*, 217 U.S. 349, 378 (1910), and in light of "the evolving standards of decency that mark the progress of a maturing society." *Trop* v. *Dulles*, 356 U.S. 86, 101 (1958).

Thus, pursuant to either chain of analysis, it is incumbent upon us to determine whether imposition of the mandatory death penalty for rape-murder serves a compelling State interest and whether its use is the least restrictive means toward furtherance of a permissible goal.

2. I turn now to examine the interests advanced by the Commonwealth in order to determine whether the mandatory death penalty for rape-murder is constitutional.

I recognize at the outset that the Commonwealth has a vital interest in protecting society from rape-murderers and in deterring rape-murder. My inquiry must look beyond these vital interests, however, to determine whether the means chosen, use of the death penalty as punishment for convicted rape-murderers, is compelled as the least restrictive means available to further these ends. In order to achieve the proper balance, I must determine whether these interests can be effectively served by means which do not impair fundamental constitutional rights, here the right to life, to the extent that the death penalty does.

It is not difficult to identify the discrete interests thought to be served by our penal policy. The Commonwealth identifies three areas of vital interest: (1) saving lives, (2) protecting citizens from crimes of violence, and (3) ensuring justice and diminishing recourse to vigilantism. Translated into the more familiar jargon of penology and corrections, these interests are, respectively, (1) deterrence, (2) isolation/incapacitation, and (3) retribution/moral reinforcement.[11] See Packer, The Limits of the Criminal Sanction 35-38 (1968). I examine these interests seriatim, keeping in mind that a proper balance

---

[11] There is, of course, one additional objective of punishment which has *not* been urged by the Commonwealth to justify use of capital punishment. "The *reformation* of the individual offender is usually regarded as an important function of punishment. But it can have no application where the death penalty is exacted." Report of the

requires that the inquiry be "not whether death serves these supposed purposes of punishment, but whether death serves them more effectively than [life] imprisonment." *Furman* v. *Georgia*, 408 U.S. 238, 303 (1972) (Brennan, J., concurring).

A. *Deterrence.*

"[T]he question to be considered is not simply whether capital punishment is a deterrent, but whether it is a better deterrent than life imprisonment." *Furman* v. *Georgia, supra* at 346-347 (Marshall, J., concurring). See Bedau, Deterrence and the Death Penalty: A Reconsideration, 61 J. of Crim. L., Criminology and Police Science 539, 542 (1971); Morris & Zimring, Deterrence and Corrections, 381 The Annals 137 (1969). Despite the most exhaustive research by noted experts in the field, there is simply no convincing evidence that the death penalty is a deterrent superior to lesser punishments. In fact, the most convincing studies point in the opposite direction.

By Res. of 1967, c. 150, the Massachusetts Legislature established a special commission to investigate and study the effectiveness of capital punishment as a deterrent to crime. The commission was composed of legislators, educators, attorneys and others prominent in the criminal justice field. In its interim report issued in October, 1968, the commission stated: "It is the opinion of the majority . . . that the death penalty is not a deterrent to crime. No evidence presented to this Commission substantiated the proposition that capital punishment is a more effective deterrent to murder than imprisonment." Report, p. 5. The commission went on to say that "[t]he evidence clearly establishes that at the very least the

---

Royal Commn. on Capital Punishment, 1949-1953, 18 (HMSO 1953). Killing convicted criminals is utterly inconsistent with rehabilitation, and the death penalty obviously negates and utterly frustrates any interest the Commonwealth has in that ultimate goal.

death penalty is no more of a deterrent than life imprisonment." *Id.* at 12.

These findings are consistent with those of the special commission to investigate and study the abolition of the death penalty in capital cases established in 1957 (Res. of 1957, c. 141). That commission concluded that "[c]apital punishment is not a better protection against murder than a sentence of life imprisonment." 1959 House Doc. No. 2575, p. 44.

The conclusions of these legislative commissions are in accord with the results reached by virtually all contemporary criminologists who have studied deterrence and the death penalty in the United States. Examples of their conclusions are as follows: "The preponderance of the evidence indicates that capital punishment does not act as a deterrent to murder." Chambliss, Types of Deviance and the Effectiveness of Legal Sanctions, 1967 Wis. L. Rev. 703, 704. "It now seems established and accepted that the existence or nonexistence of capital punishment . . . makes no difference to the homicide rate or to the attempted-homicide rate." Morris and Zimring, Deterrence and Corrections, 381 The Annals 137, 143 (1969). "[S]tatistical findings and case studies converge to disprove the claim that the death penalty has any special deterrent value." Schuessler, The Deterrent Influence of the Death Penalty, 284 The Annals 54, 62 (1952). "The conclusion is inevitable that the presence of the death penalty — in law or practice — does not influence homicide death rates." Sellin, Capital Punishment 138 (1967).

These conclusions are based on numerous studies utilizing various techniques. Several studies have compared the homicide rates in States that have abolished capital punishment with carefully matched similar and/or contiguous States that have retained it.[12] These

---

[12] Homicide rates are a fairly accurate predictor of capital murder rates as the proportion of capital homicide to the crude homicide rate

studies uniformly conclude that homicide rates "are con-
ditioned by other factors than the death penalty." Sellin,
The Death Penalty, Appendix to Am. Law Inst., Model
Penal Code (Tent. Draft No. 9, 1959) at 24. See Schues-
sler, The Deterrent Influence of the Death Penalty, *supra*
at 57-58. Thomas, This Life We Take 14-15 (4th rev.
1970).

Additionally, studies have been conducted where the
homicide rates of States that have abolished capital
punishment have been compared before and after aboli-
tion. These studies also indicate that there is no increase
in the homicide rate after abolition. Reckless, The Use
of the Death Penalty, 15 Crime and Delinquency 43, 54
(1969). Sellin, The Death Penalty, *supra* at 34-38. The
same result is obtained by comparing the experience in
other countries before and after abolition. See Bowers,
Executions in America 123-126 (1974). Similarly, the in-
crease in homicide rates experienced after the "judicial
moratorium" on executions in 1967 by States which had
retained capital punishment was no greater than in those
States that had abolished it, and, in fact, the over-all
increase in homicide rates from 1969-1970 was lower
than that from 1964-1967. *Id.* at 139-147.

Finally, comparisons of the homicide rates in selected
jurisdictions for periods immediately prior to and after
publicized executions or sentences of death indicate no
significant differences, suggesting that the execution or
sentence did not effectively deter others. Reckless, The
Use of the Death Penalty, *supra* at 54-55. Savitz, A
Study in Capital Punishment, 49 J. of Crim. L., Crimi-
nology and Police Science 338 (1959). While these two
particular studies are of limited validity and reliability
because of restricted sampling, they present some indica-

---

remains fairly constant from year to year and from jurisdiction to
jurisdiction. Sellin, The Death Penalty, Appendix to Am. Law Inst.,
Model Penal Code (Tent. Draft No. 9, 1959) 23-24.

tion that neither the availability nor the actual use of the death penalty acts as an effective deterrent.[13]

The studies previously cited make no distinctions between mandatory and discretionary use of capital punishment. In fact, however, most were conducted in situations involving the discretionary use of the death penalty, and thus their relevance to the mandatory death penalty at issue here could be questioned. However, a recent study conducted by Professor William J. Bowers, a noted sociologist, concludes that there is "no indication that the mandatory death penalty . . . [is] a more effective deterrent of homicide than discretionary capital punishment." Bowers, Executions in America, *supra* at 160.

Professor Bowers examined the homicide rates in States that changed from mandatory to discretionary capital punishment. Additionally, he compared these rates with contiguous States that were consistent in maintaining either fully mandatory or discretionary capital sentencing. He found no statistically significant changes in homicide rates as a result of these changes in practice. Among those States studied were Massachusetts and Connecticut, both of which changed from mandatory to discretionary use of the death penalty in 1951. Professor Bowers found that "Massachusetts experienced remarkable stability of homicide rates after the change, and Connecticut actually had a decline in homicide rate . . .. Clearly, the statutory changes in Connecticut and Massachusetts did not result in increasing homicide rates, nor even an increase relative to their contiguous states." *Id.* at 149-150.

---

[13] There is some question as to whether executions carried out in private, with limited publicity and no public access, can ever be an effective deterrent. Perhaps deterrence could be more effectively achieved by making executions public, but no one has seriously advocated this position for many decades. See Camus, Reflections on the Guillotine, in Resistance, Rebellion and Death 173, 180-182 (1969). Today we reject public executions as debasing and brutalizing to us all. *Furman* v. *Georgia,* 408 U.S. 238, 297 (1972) (Brennan, J., concurring).

Based on considerable data, both before and after World War II, Bowers concluded: "[W]e must unequivocally reject the claim that mandatory death sentencing has any deterrent advantage over the discretionary use of capital punishment." *Id.* at 157.[14]

There is correspondingly no statistical support for the proposition that law enforcement officials are safer in jurisdictions that retain capital punishment as opposed to those in which it has been abolished. Claims that more police are killed in abolition States are simply not supported by available data. "On the whole, the abolition states . . . seem to have fewer killings, but the differences are small." Sellin, The Death Penalty and Police Safety, in Sellin, Capital Punishment 138, 152 (1967). "[T]he data available . . . after a survey of half the state police forces of the United States do not lend empirical support to the claim that the existence of the death penalty in the statutes of a state provides a greater protection to the

---

[14] The fact that a mandatory death penalty has not been shown to act as a greater deterrent to homicide is not surprising when consideration is given to the fact that mandatory death sentences lead to low conviction rates. In a study conducted in Massachusetts during a period of mandatory capital punishment for murder in the first degree, statistics reveal that only 8% of those indicted for murder were convicted of murder in the first degree and less than 7% were actually executed. Ehrmann, The Death Penalty and the Administration of Justice, 284 The Annals 73, 74-79 (1952). See Bowers, Executions in America, *supra* at 161-162. This refusal by juries to convict in capital cases where there is a mandatory death sentence has been documented on many occasions. See, e.g, *McGautha* v. *California*, 402 U.S. 183, 199 (1971); Shipley, Does Capital Punishment Prevent Convictions? 43 Am. L. Rev. 321 (1909); Knowlton, Problems of Jury Discretion in Capital Cases, 101 U. Pa. L. Rev. 1099 (1953). See also Kalven & Zeisel, The American Jury 310-312 (1966). The relationship between mandatory capital punishment and deterrence is best exemplified by the following quote: "Antebellum Americans, . . . whose experience with mandatory capital punishment was extensive, tended to account it a dangerous failure. They were satisfied that mandatory capital punishment did indeed have a deterrent effect; it deterred jurors from convicting palpably guilty men." Mackey, The Inutility of Mandatory Capital Punishment: An Historical Note, 54 B.U.L. Rev. 32, 35 (1974) (footnote omitted).

police than exists in states where that penalty has been abolished." Campion, Does the Death Penalty Protect State Police? in Bedau, The Death Penalty in America 301, 314-315 (rev. ed. 1967).

While the overwhelming majority of serious studies in this area have concluded that capital punishment has no special deterrent effect, one recent study and several subjective reports have indicated a contrary result.

The single scientific study which gives any indication that the death penalty may have a deterrent effect is Ehrlich, The Deterrent Effect of Capital Punishment: A Question of Life and Death, Am. Economic Rev. 397 (June, 1975). Ehrlich utilizes regression analysis to demonstrate that capital punishment has deterred several homicides in the past. However, serious flaws have been revealed both in Ehrlich's approach and in his results.[15] We are not persuaded that this study adds much, if anything, to our analysis.

The other studies cited by the Commonwealth for the proposition that the threat of capital punishment acts as a deterrent are collections of the subjective statements of apprehended felons and police to the effect that many perpetrators of crime carried phony or unloaded weapons because they were afraid of the death penalty. Los Angeles Police Department Study (1971), cited in 52 Congressional Digest 21 (1973). (See Bedau, The Death Penalty in America, 267 [rev. ed. 1967], for an earlier version of this study.) These reports are particularly unreliable because the statements were made under apparently coercive circumstances where the subjects

---

[15] The Ehrlich study has been severely attacked on many grounds. While much of the criticism is extremely technical, see, e.g., Passell and Taylor, The Deterrent Effect of Capital Punishment: Another View (Col. U. Discussion Paper No. 74-7509, March, 1975), it essentially attacks the methodology, the use of arbitrary assumptions regarding the mathematical form of relationships among variables, the sensitivity of the model to minor statistical variation and the failure to take into consideration the interdependence of relevant variables.

might be expected to have said whatever they believed the police wanted to hear. This expectation is corroborated by former San Quentin Warden Clinton Duffy who acknowledged the statements allegedly made to police, but added, "[W]hen . . . everything is resolved legally, . . . I believe that they give you a little bit more of the regular story than they do when they are in jail trying to curry a little bit of favor." To Abolish The Death Penalty, Hearings on Senate Bill 1760 before the Subcommittee on Criminal Laws and Procedures, Committee on the Judiciary, U. S. Senate, March 20, 21, and July 2, 1968, 23 (G. P. O. 1970). Warden Duffy interviewed many inmates confined at San Quentin and stated: "I have, to date, not had one person say that they had ever thought of the death penalty prior to the commission of their act." *Ibid.* Thus, I conclude that these two sources of support for the proposition that the death penalty acts as a deterrent to homicide in fact actually provide little support at all.

My review of the available studies and other material cited reveals no firm indication that capital punishment acts as a superior deterrent to homicide than other available punishments.[16] At best the evidence is equivocal. I am thus unable to find that the Commonwealth has a compelling interest in deterrence which cannot adequately be served by other less restrictive means of punishment.

B.   *Isolation/Incapacitation.*

While isolating convicted murderers from society in order to prevent their commission of similar crimes in the future is a legitimate objective of punishment, it seems

---

[16] It is noteworthy in this regard that the report of the Massachusetts Special Commission stated, "It is the swiftness and certainty of punishment and not its severity that deters." 1959 House Doc. No. 2575, p. 44. Cases where a mandatory death sentence is the ultimate sanction take longer to litigate and tend to involve more protracted appellate procedures. See *Furman* v. *Georgia*, 408 U. S. 238, 357-358

clear that this goal can be effectively served by means less restrictive than death. "The sufficient answer [to the claim that the infliction of death is necessary to stop those convicted of murder from committing further crimes] . . . is that if a criminal convicted of a capital crime poses a danger to society, effective administration of the State's pardon and parole laws can delay or deny his release from prison, and techniques of isolation can eliminate or minimize the danger while he remains confined." *Furman* v. *Georgia*, 408 U. S. 238, 300-301 (1972) (Brennan, J., concurring).

Additionally, it should be stressed that "murderers in general have been shown to be among the least recidivistic of offenders." Packer, The Limits of the Criminal Sanction 52 (1968). This is true with regard both to incidents while on parole, Giardini and Farrow, The Paroling of Capital Offenders, 284 The Annals 85 (1952); Stanton, Murderers on Parole, 15 Crime and Delinquency 149 (1969); Bedau, Parole of Capital Offenders, Recidivism, and Life Imprisonment, in Bedau, The Death Penalty in America 395 (rev. ed. 1967); Miller, Some Notes on Death Row and the Death Penalty in Massachusetts (1971), and to incidents of violence while in prison. Sellin, The Death Penalty, Appendix to Am. Law Inst., Model Penal Code (Tent. Draft No. 9, 1959) 70-71. "Once released from prison . . . [convicted murderers] have a very low rate of reconviction for any criminal offenses, let alone for murder." Packer, *supra*, at 52-53.

It is true that in the Eighteenth and early Nineteenth Centuries, before creation of an effective prison system, the death penalty was considered necessary for the protection of society. See Bedau, The Courts, the Constitution, and Capital Punishment 1968 Utah L. Rev. 201,

---

(1972) (Marshall, J., concurring). In this way, the availability of capital punishment tends to decrease, rather than increase, the deterrent effect of criminal sanctions.

232. However, "[n]ationally, there is substantial information now available to show that murderers can be incarcerated and paroled with safety, and that there is no discernible difference in this regard between those who are found guilty of one rather than another kind of criminal homicide." Bedau, Death Sentences in New Jersey, 1907-1960, 19 Rutgers L. Rev. 1, 47 (1964). While this may be somewhat less true of convicted rape-murderers, who are more likely to act as a result of uncontrolled or uncontrollable desires,[17] measures are available to ensure the safe care and custody of such persons where a real danger to society is indicated. See, for example, the statute providing for care and treatment of "sexually dangerous persons," G. L. c. 123A.

Accordingly, I am not convinced that the death penalty is necessary as the best means of protecting society from the convicted rape-murderer, and I believe that the Commonwealth's interest in isolation/incapacitation, while vital, can be adequately served by less onerous means.[18]

## C. *Retribution/Moral Reinforcement.*

The Commonwealth contends that it has a compelling

---

[17] The recidivism rate for convicted rapists released on parole is almost three times greater than that for convicted murderers. Compare Callahan, Statistical Tables Describing the Characteristics and Recidivism Rates of Men Released During 1966 from M.C.I. Norfolk, M.C.I. Walpole, M.C.I. Concord, and the Massachusetts Forestry Camps (1971), with Miller, Some Notes on Death Row and the Death Penalty in Massachusetts (1971). To the extent that the statistics for rape may be more relevant in determining the appropriate recidivism rate for rape-murderers, it is possible that this class of murderers is more likely to become involved in subsequent criminal activity if released than murderers in general.

[18] Utilization of imprisonment to "incapacitate" the convicted rape-murderer serves the additional desirable function of keeping him available in the event error should subsequently be discovered and the adjudication of his guilt reversed. Such instances are not unknown in our criminal law. See Borchard, Convicting the Innocent (1970); Frank, Not Guilty (1957). See also Sellin, The Death Penalty, Ap-

interest in ensuring justice and maintaining the social compact, and that utilization of proportional punishment is necessary to achieve that goal. It further contends that under this scheme the death penalty is the appropriate punishment for rape-murder. However, while I agree that the interests advanced are valid and that moral reinforcement or reprobation requires that the most serious crimes be punished most seriously, I believe that " [g]rading punishments according to the severity of the crime does not require that the upper limit of severity be the death penalty." Bedau, The Death Penalty in America 268 (rev. ed. 1967). This is true in part because no assessment of the degree of punishment necessary to effect retribution is possible.[19] The demand for punishment does not define the nature of the punishment necessary for retributive purposes, and it cannot be shown that any particular penalty is more supportable in light of these purposes than any other.[20] Furthermore, I believe that "it is incompatible with the dignity of an

---

pendix to Am. Law Inst., Model Penal Code (Tent. Draft No. 9, 1959) 63-65. The words of Thomas Jefferson are particularly appropriate here: "I shall ask for the abolition of the punishment of death until I have the infallibility of human judgment demonstrated to me." Quoted by Senator Hart, Hearings on Senate Bill 1760, Committee on the Judiciary, U. S. Senate 14 (G. P. O. 1970).

[19] The notion that the public wants capital punishment is based more on abstract emotion than hard reality. When faced squarely with the choice and responsibility of putting someone to death, jurors overwhelmingly avoid the death sentence. Statistics obtained from Suffolk County indicate that, since 1963, juries recommended that the death penalty not be imposed in at least thirty-nine cases involving some fifty-five defendants. As one's proximity to the actual sentence of death and responsibility therefor increases, the belief that capital punishment is appropriate appears to diminish in fervor. The rhetorical question has often been put: "How many advocating the death sentence would be willing to pull the switch?"

[20] If death is the most appropriate punishment for murder in a retributive sense, then burning to death would seem to be the most appropriate punishment for arson resulting in death or stabbing to death when the murder is committed by stabbing. However, few people

enlightened society to attempt to justify the taking of life [merely] for purposes of vengeance." *People* v. *Anderson*, 6 Cal. 3d 628, 651 (1972), cert. den. sub nom. *California* v. *Anderson*, 406 U. S. 958 (1972). While retribution *may* be a permissible aspect of punishment, it "is no longer the dominant objective of the criminal law," *Williams* v. *New York*, 337 U. S. 241, 248 (1949), and it cannot act as the sole justification for a particular penalty. See 1959 House Doc. No. 2575, at 43.

The Commonwealth also suggests that capital punishment is necessary to prevent recourse to vigilantism. However, "[t]here is no evidence whatever that utilization of imprisonment rather than death encourages private blood feuds and other disorders." *Furman* v. *Georgia*, 408 U. S. 238, 303 (1972) (Brennan, J., concurring). To the contrary, "[r]eliable statistics now pretty definitely show that the states that have had the most homicides and the most legal executions have also had the most illegal executions, in the form of lynchings." Bedau, The Death Penalty in America, *supra* at 335. See Caldwell, Why is the Death Penalty Retained? 284 The Annals 45, 46-47 (1952). See also 1959 House Doc. No. 2575, at 24.[21] There is simply no basis for the claim that the death penalty is necessary "to prevent an outraged community from taking the law into its own hands." Sellin, The Death Penalty, Appendix to Am. Law Inst., Model Penal Code (Tent. Draft No. 9, 1959) 79.

---

today would contend that such a punishment is desirable, or, in fact, constitutionally permissible. The problems in allowing retribution in the "lex talionis" sense to govern the choice of criminal sanction are obvious.

[21] This positive correlation between legal executions and illegal executions may well be a by-product of the "brutalizing effect" of capital punishment. See Bowers, Executions in America 194 (1974). "The existence of capital punishment tends to cheapen human life. It tends to encourage both children and adults to believe that physical violence, the ultimate form of which is putting an individual to death, is a proper method of resolving social and personal conflict." 1959 House Doc. No. 2575, at 45.

I am compelled to the conclusion that the Commonwealth has not sustained its burden of establishing that the death penalty is a necessary and least restrictive means for accomplishment of whatever valid interests it may have in ensuring justice and maintaining the social compact. Whatever marginal benefit use of capital punishment *might* have in serving the interests of retribution or moral reinforcement is not sufficient to withstand the strict constitutional scrutiny required here.

On the basis of the foregoing analysis, I conclude, as I must, that the Commonwealth has not offered an adequate justification for retention of the mandatory death penalty for rape-murder.[22] The Commonwealth has not met its heavy burden of demonstrating that, in pursuing its legitimate objectives, it has chosen means which do not unnecessarily impinge on the fundamental constitutional right to life. Accordingly, I believe that the mandatory death penalty for murder committed in the course of rape or attempted rape violates both the "due process" clauses of the Massachusetts Constitution, arts. 1, 10 and 12, and the cruel or unusual punishments clause of art. 26,[23] and I concur in the judgment of the court.

---

[22] A similar conclusion was reached by Sir Ernest Gowers who, as chairman of the British Royal Commission to study capital punishment, spent almost five years of intensive research and study on the issue. He stated: "Before serving on the Royal Commission I, like most other people, had given no great thought to this problem. If I had been asked for my opinion, I should probably have said that I was in favour of the death penalty, and disposed to regard abolitionists as people whose hearts were bigger than their heads. Four years of close study of the subject gradually dispelled that feeling. In the end I became convinced that the abolitionists were right in their conclusions — though I could not agree with all their arguments — and that so far from the sentimental approach leading into their camp and the rational one into that of the supporters, it was the other way about." Sir Ernest Gowers, A Life for a Life? foreword (London 1956).

[23] In arriving at this conclusion I would not intend to foreclose the Commonwealth from enacting any statute authorizing the death

3. This opinion, and the concurring and dissenting opinions of Justices Braucher and Reardon which follow, reflect three different and distinct views as to the role of this court in the adjudication of constitutional issues. Each has a different perspective on the proper exercise of our constitutional responsibilities when dealing with pronouncements of the legislative branch of the government. In view of the important and complex issues before us and the manner in which the concurring and dissenting opinions were articulated, I find it necessary to comment briefly on them.

A. Justice Braucher concurs in the result of today's decision, but reaches that result based on his interpretation of the statute, c. 265, § 2. I believe Justice Braucher seeks to avoid reaching the constitutional issues at the cost of distorting the clear language and history of the statute.

I believe it is inappropriate, if not improper, for this court to resort to doubtful statutory construction in order to evade important constitutional questions properly before us. See *School Comm. of Springfield* v. *Board of Educ.* 366 Mass. 315, 339-350 (1974). "Judicial self-restraint in reaching constitutional attacks on legislative amendments and judicial rules of statutory construction are both predicated on our desire to respect the Legislature's special prerogative in enacting legislation. I feel that the purposes underlying both these doctrines will be ill served by a ruling which avoids reaching a constitutional question by giving a strained and unreasonable construction of the statute which negates its clear intent." *First Natl. Bank* v. *Attorney Gen.* 362 Mass. 570, 579-581 (1972) (Tauro, C.J.)

---

penalty. However, if such a statute should be enacted, the burden would be on the Commonwealth to establish that such use of the death penalty is the least restrictive means for furtherance of a compelling State interest. My opinion is restricted solely to the pertinent statute which mandates the death penalty in rape-murder cases.

The use of strained statutory interpretations invades the legislative province and disturbs the proper balance between legislative and judicial function. It transforms what the Legislature said into something the Legislature never intended.[24] In doing so, such strained interpretations do more to violate the spirit of art. 30 of the Massachusetts Declaration of Rights than does facing a constitutional issue which is properly presented. "The canon of avoidance of constitutional doubts must, like the 'plain meaning' rule, give way where its application would produce a futile result, or an unreasonable result plainly at 'variance with the policy of the legislation as a whole.'" *Shapiro* v. *United States,* 335 U.S. 1, 31 (1948), and cases cited. Accord, *United States* v. *Sullivan,* 332 U.S. 689, 693 (1948); *Scales* v. *United States,* 367 U.S. 203, 211 (1961); *Welsh* v. *United States,* 398 U.S. 333, 345, 354-356 (1970) (Harlan, J., concurring). See, generally, note, Supreme Court Interpretation of Statutes to Avoid Constitutional Decisions, 53 Col. L. Rev. 633 (1953).

With this in mind, I turn to Justice Braucher's concurring opinion. Relying on *Commonwealth* v. *Harrington,* 367 Mass. 13 (1975), he believes that his construction of the statute avoids the constitutional issues and would be "not only fairly possible but plainly right." He assails my opinion in *O'Neal II* as an attempt to create a constitutional issue and resolve it by ignoring "the *clear statutory direction* that rape murder cases be treated like other cases in which no jury recommendation is made" (281) (emphasis added). With all due respect, it is my

---

[24] "When a judge tries to find out what the government would have intended which it did not say, he puts into its mouth things which he thinks it ought to have said, and that is very close to substituting what he himself thinks right. Let him beware, however, or he will usurp the office of government, even though in a small way he must do so in order to execute its real commands at all." Hand, "How Far Is a Judge Free in Rendering a Decision?" in The Spirit of Liberty 79, 83 (I. Dillard ed. 1959).

view that no such "clear statutory direction" is available from either the words or the history of c. 265, § 2. I think Justice Braucher is plainly wrong.

The language of c. 265, § 2, as amended by St. 1951, c. 203, is clear. It provides that no recommendation of clemency "shall be made . . . if the murder was committed in connection with the commission of rape or an attempt to commit rape." This provision was added as an amendment to a statute which would have made the death penalty discretionary in all cases. See 1951 House Doc. No. 2148. At the time this provision was approved, three other provisions, which would have retained mandatory capital sentencing in three other circumstances,[25] were defeated. Mandatory capital sentencing appeared in no other murder offense. See 1951 Senate Journal at 608-612. Thus, the Legislature manifested a clear intention that rape-murder be treated differently from all other types of murder.

The history of the 1951 amendment since its enactment indicates that in a great majority of non-rape-murder cases juries have recommended that the death penalty not be imposed.[26] Jury clemency is precisely what the Legislature intended to avoid in rape-murder cases; accordingly, it was put beyond the power of the jury in such cases to eliminate the death penalty. There is something seriously amiss in the logic and reasoning of Justice Braucher's conclusion that there is a "clear statutory direction that rape murder cases be treated like other cases in which no jury recommendation is made." The

---

[25] The four amendments proposed in the Senate would have prevented jury recommendations of clemency where (1) the murder was committed by a person previously convicted of murder, (2) the victim was a police officer, (3) the murder was committed in an escape attempt or by one under a life sentence or previous sentence of death, or (4) the murder was committed in the course of rape or attempted rape.

[26] See Cannon, First Degree Murder: The Post Conviction Experience in Massachusetts 4 (1974).

significant and important difference is that in rape-murder cases, the *Legislature* mandates the death penalty; in other murder cases, the question is left to the *jury*. Justice Braucher ignores this obvious distinction, which is supported by both the language and the history of the amendment, merely to avoid reaching a most difficult but important constitutional issue. In doing so, the entire analysis of his concurring opinion is rendered suspect. I cannot agree with his interpretation of the statute, nor can I subscribe to such an avoidance of our constitutional duty.

B. I strongly disagree with Justice Reardon's novel suggestion that we refrain from construction and application of our State Constitution while we await decision of the Federal constitutional issues in *North Carolina* v. *Fowler*, 285 N.C. 90 (1974), cert. granted, 419 U.S. 963 (1974). The point is utterly without merit. This court — not the Federal courts — bears ultimate responsibility for construction of our State Constitution. Our interpretation of the State Constitution is final and cannot be challenged in the Federal courts. A Federal court decision cannot dispose of State constitutional issues confronting us. See *Minnesota* v. *National Tea Co.*, 309 U.S. 551, 552-555, 558-559 (1940) (opinion of the court and of Hughes, C.J., dissenting).

Justice Reardon's allusion to preserving a vague "symmetry of the law" cannot warrant delay. See *Commissioner of Corps. & Taxn.* v. *Bullard*, 313 Mass. 72, 93-94 (1943). It serves only to cloud the issue. Justice Reardon's objective of "symmetry" is, in reality, a suggestion of uniformity of State and Federal constitutional direction with a resulting subservience to Federal precedent. Such "symmetry" would sweep aside the Declaration of Rights and deprive the Commonwealth's citizens of the Declaration's protection against arbitrary and intrusive government.

The fact that analysis under our State Constitution may parallel analysis under the Federal Constitution or that

the analysis under the State Constitution may call for comparative construction of similar Federal provisions is no basis for evading our responsibility to declare the constitutional law which may be dispositive of the case. Although the United States Supreme Court must ultimately determine the scope and meaning of the Federal Constitution and establish uniformity of construction, State courts such as ours have the power and the obligation, when necessary, to state our own construction of the Federal Constitution in its application to a given case. That power, which has sanction in the Federal Constitution,[27] is essential if the State courts are to comply with their overriding obligation to decide cases *as they are presented* without contravening the supreme Federal law. *Martin* v. *Hunter's Lessee*, 14 U.S. (1 Wheat.) 304, 340-342 (1816). Cases constantly raise constitutional issues of first impression which have not been addressed by previous decisions of the United States Supreme Court. State courts cannot withhold decision in the perhaps vain hope that a future[28] Supreme Court judgment will decide the precise point at issue and "take them off the hook." They must fill the interstices among the Supreme Court's constitutional holdings with their own constructions and accept the risk that a future Supreme Court will find those constructions discordant with its own.[29]

---

[27] "In the scheme of the Constitution, [the State courts] are the primary guarantors of constitutional rights." Bator and others, Hart & Wechsler's, The Federal Courts and the Federal System 359 (2d ed. 1973).

[28] A judge cannot predict when a case will be decided. The history of the *Fowler* case should amply document this proposition. The case, argued once before on April 21, 1975, has been scheduled for reargument by the Supreme Court (422 U.S. 1039 [1975]), but the date has not yet been set and there is no indication of when the argument will take place.

[29] A further consideration is relevant here. At times we have indicated that our rulings in cases were reached reluctantly under the compulsion of decisions of the United States Supreme Court. We did

In urging that we defer consideration of this case, Justice Reardon would follow the safe course — he would avoid the risk of a discordant Supreme Court result. In the process, he would deny the defendant his undoubted right to a speedy determination (and effectuation) of essential constitutional rights and would implicitly deny our responsibility to decide cases before us. I believe the exercise of our duties and the interest in speedy, orderly disposition of cases must take precedence over the avoidance of such risk.

C. Justice Reardon's concern with the due process argument has been dealt with elsewhere and requires only a brief comment here.

Justice Reardon indicates the depth of his problem in applying due process concepts to capital punishment with the following statement: "If 'life' is a fundamental interest under the Constitution, why is not 'liberty' also a fundamental interest?" In another context he asks the same rhetorical question as to the right of privacy. However, Justice Reardon has answered his own questions logically and rationally, with his statement: "It may be argued of course that nothing is so fundamental as the right to life, that it is an interest on another plane altogether." But not being content with his own answer he then reverts to his old problem by saying, in effect, that in the application of due process he cannot distinguish between taking a life and sending a man to jail or invading his privacy! Thus, he concludes, there is no fundamental right to life guaranteed by the Constitution.

---

so recently in *Commonwealth* v. *A Juvenile,* 368 Mass. 580, 583 (1975). Other jurisdictions have followed the same path. It makes more sense, when we have the opportunity, to expound our views *before* Supreme Court decisions are rendered on the issue than to criticise that Court's decisions after the fact when we have remained mute. Only the former approach gives any hope of providing the Supreme Court with fresh innovative thinking. On occasion the Supreme Court has explicitly adopted not only the holding of a State court but also the court's reasoning in reaching its decision. See *Reitman* v. *Mulkey,* 387 U.S. 369 (1967).

D. Justice Reardon also warns against allowing personal philosophical views on capital punishment to impel a decision which may be at odds with the popular will. I assume that Justice Reardon has very much in mind the California experience after *People* v. *Anderson,* 6 Cal. 3d 628 (1972), cert. den. 406 U.S. 958 (1972). A constitutional amendment, in effect, negated a ruling of the California Supreme Court that capital punishment is unconstitutional.

I agree that personal philosophies should form no part of constitutional decision-making. We sit as appellate judges in cases raising constitutional issues not to enshrine our personal views in the Constitution, but to construe that document with its occasionally complex and uncertain language and apply it to the facts before us. Construction is necessary because a Constitution, by its nature, cannot contain explicit solutions for all problems. As Mr. Chief Justice Marshall wrote: "A constitution, to contain an accurate detail of all the subdivisions of which its great powers will admit, and of all the means by which they may be carried into execution, would partake of the prolixity of a legal code, and could scarcely be embraced by the human mind." *M'Culloch* v. *Maryland,* 17 U.S. (4 Wheat.) 316, 407 (1819). But the detail supplied by case-by-case construction and application must not have its foundation in the judge's personal views. These views must be subordinated to the principles underlying the document to be construed.[30]   "[T]he ultimate

---

[30] "For judges, it is not merely a desirable capacity 'to emancipate their purposes' from their private desires; it is their duty. . . . Does . . . [a man] change his character by putting on a gown? No, he does not change his character. He brings his whole experience, his training, his outlook, his social, intellectual, and moral environment with him when he takes a seat on the supreme bench. But a judge worth his salt is in the grip of his function. The intellectual habits of self-discipline which govern his mind are as much a part of him as the influence of the interest he may have represented at the bar, often more so." Frankfurter, Of Law and Men: Papers and Addresses of Felix Frankfurter, 1939-1956, 40-41 (Elman ed. 1965).

touchstone of constitutionality is the Constitution it-self . . . ." *Graves* v. *New York ex rel. O'Keefe*, 306 U.S. 466, 491 (1939) (Frankfurter, J., concurring). Construction takes the outline of principle established by the words of the document and fills it with substance. The judge exercises his judgment to determine, in the light of prior cases, the reasoning expressed therein, his experience and his training, what substance is required by the principle.

However, judges cannot look to public opinion polls or election results for constitutional meaning as has been suggested. It is our duty to interpret the Constitution to the best of our personal abilities and judgment. Our Constitution requires that we be "as free, impartial and independent as the lot of humanity will admit." Massachusetts Declaration of Rights, art. 29. If we succumb to contemporary public opinion we lose that requisite independence and impartiality demanded of us and fail totally in our purpose. The words of Attorney General Rufus Choate in his address before the Constitutional Convention of 1853 are particularly apposite here: "If a law is passed by a unanimous legislature, clamored for by the general voice of the public, and a cause is before . . . [a judge] on it, in which the whole community is on one side and an individual nameless or odious on the other, and he believes it to be against the Constitution, he must so declare it, — or there is no judge." 2 Brown, The Works of Rufus Choate with a Memoir of his Life 287 (1862).

Oppressed, disfavored or unpopular minorities would be the victims of any loss of judicial independence. The minorities rely on the independence of the courts to secure their constitutional rights against incursions of the majority, operating through the political branches of government. Dependent or subservient courts render nugatory the fundamental constitutional protections which are the heart of our liberties.[31] "The complete inde-

---

[31] Had the Justices of the United States Supreme Court considered public reaction at the time, how likely would they have been to hand

pendence of the Courts of justice is peculiarly essential in a limited Constitution. . . . Limitations of this kind can be preserved in practice no other way than through the medium of the Courts of justice; whose duty it must be to declare all Acts contrary to the manifest tenor of the Constitution void. Without this, all the reservations of particular rights or privileges would amount to nothing." The Federalist Papers No. 78 (1788).

Passing public passions and emotions (understandable as they may be at times such as these) have little to do with the meaning of the Constitution, as it is written. Referendums, although they serve some purpose, do not pretend to construe the Constitution. They express only ephemeral sentiments, sentiments which are highly variable over time and which may reflect public attitudes shaped by collateral problems and events of the day. Public sentiment becomes relevant to constitutional adjudication *only* if it results in a constitutional amendment. This is a result which occurs only when the public sentiment is sufficiently high and sustained so that it is not dissipated with the passing of time and further reflection. When the Constitution is thus amended, the popular will has been properly exercised; the fundamental document's principles have been altered in accordance with the procedures set forth in the compact. Only through an amendment can mass passions affect constitutional meaning and, absent an amendment, the Constitution stands as an unbreachable bulwark for the individual against those mass passions and the political power of the majority.

Thus, the fact that the people of California amended their Constitution after the highest court of that State declared the death penalty unconstitutional does not indicate to me that we should not reach and decide a properly presented constitutional issue in accordance with

down their landmark decision in *Brown* v. *Board of Educ. of Topeka*, 347 U.S. 483 (1954)?

our considered views of the statute and Constitution. It merely indicates the possibility that an amendment to our Constitution *may* be the popular response to our decision. If this eventuates, so be it. The amendment, and not a judicial anticipation of such a response, is the proper constitutional procedure.

In conclusion, I add a few words: It is strange for Justice Reardon to imply that some members of this court or other courts who seek in good faith to exercise their judgment on difficult constitutional issues do so by improperly substituting personal views for the constitutional document. One wonders then what the basis of *his* opinion is and how he would respond to identical ad hominem charges. One might well infer that he draws his views from the public views he emphasizes. But is this the proper exercise of judicial independence mandated by the Constitution?[32]

The answer to this rhetorical question has been amply stated above. It can be summarized, briefly and simply. The great responsibility of a judge is to exercise his best judgment in applying his interpretation of the law to the facts. No judge should ever be concerned with whether his decision will be popular or unpopular. He does his job always with complete awareness that political considerations of the day, contemporary public emotions (no matter what their motivation), and personal philosophies are completely foreign and irrelevant to the exercise of his judicial power. This is the very essence of judicial duty — no less should be given and no more should be required.

---

[32] "I wish POPULARITY: but, it is *that* popularity which *follows*; not that which is *run after*. It is *that* popularity which, sooner or later, never fails to do justice to the pursuit of *noble ends,* by *noble means.* I will not *do* that which my *conscience* tells me is *wrong,* upon this occasion; to gain the huzzas of thousands, or the daily praise of all the papers which come from the press: I will not *avoid doing* what I *think is right*; though it should draw on me the whole artillery of libels; all that falsehood and malice can invent, or the credulity of a deluded populace can swallow," quoted by Lord Mansfield in *Rex v. Wilkes,* 4 Burrows Reports 2527, 2562 (1770).

HENNESSEY, J. (concurring). I concur with the opinion of the Chief Justice, in result and reasoning, and in his conclusion that the mandatory death penalty for rape-murder violates both the due process guaranty of arts. 1, 10 and 12 of the Massachusetts Constitution and the cruel punishments proscription of art. 26.[1]

I of course disagree with the two dissenting Justices who urge that our decision in this case should await the decision of the United States Supreme Court in similar pending cases. We have a duty to face these issues, at least with reference to the Constitution of the Commonwealth, without regard to cases pending in the Supreme

---

[1] I add that I also believe that all of the Justices of this court should have given further consideration, as an additional ground for our decision herein, to whether the United States Supreme Court has stated reasoning in *Furman* v. *Georgia,* 408 U.S. 238 (1972), which requires a conclusion that the death penalty as established in G. L. c. 265, §§ 1, 2, is proscribed, even as to rape-murder, by the Constitution of the United States. A majority of the Justices of the Supreme Court established by their opinions in the *Furman* case the unconstitutionality of sentencing practices which vest juries or judges with untrammeled discretion to determine whether the penalty should be death or life imprisonment. It can be argued that the law of this Commonwealth is that murder in the second degree must be submitted to the jury as a permissible verdict in every murder case, including rape-murder, regardless of circumstances. *Commonwealth* v. *French,* 357 Mass. 356, 405 (A-40) (1970). *Commonwealth* v. *Chase,* 350 Mass. 738, 744 (1966), cert. den. 385 U.S. 906 (1966). *Commonwealth* v. *Desmarteau,* 16 Gray 1, 8-11 (1860). *Commonwealth* v. *Gardner,* 11 Gray 438, 443, 445-446 (1858). See *Commonwealth* v. *Corcione,* 364 Mass. 611, 615-616 (1974); *Commonwealth* v. *Rollins,* 354 Mass. 630, 634 (1968). See also *Green* v. *Commonwealth,* 12 Allen 155, 166, 170-171 (1866). But see (as to rape-murder) *Commonwealth* v. *McGarty,* 323 Mass. 435, 441 (1948). From this it can be further argued that, since second degree murder is not punishable by the death penalty, the jury have unconstitutional untrammeled discretion in a rape-murder to choose between life imprisonment and the death penalty. It appears that dissenting Justices Reardon and Quirico would hold that the *Furman* principle is not applicable here; Justice Braucher, as well, apparently took that position in *O'Neal I.* Chief Justice Tauro, in *O'Neal I,* also stated that the principle is not applicable. Justice Wilkins, joined by Justice Kaplan, *infra,* expressly states that he does not reach Federal constitutional grounds.

Court. In this case, and others which have been argued before us and not yet decided, we have been urged by persons under sentence of death to decide the issue. They are entitled to our prompt consideration. There may be further long delay before the Supreme Court disposes of relevant cases, and it may not then decide the issues.

A further reason why this court should proceed decisively at this time, without regard to the pace of the United States Supreme Court, is that Massachusetts is unique in the context of the death penalty controversy. Between 1947 and 1972 (the *Furman* case was decided in 1972) no person was executed in this Commonwealth. During that same period I take notice that the death sentences of twenty-five persons were commuted or reduced by executive action.[2] During this time span seven different Governors served. There is the best of reasons to believe that the Constitution of the Commonwealth, a viable document, does not now permit capital punishment in rape-murder cases. There may be some kind of murders which may be shown to meet the test of compelling State interest which we have said is constitutionally required; perhaps crimes which in their characteristics are a peculiar and serious threat to public order and safety (e.g., murders related to terrorism and kidnapping) are of that order. Beyond that, if the present will of the people of the Commonwealth is that capital punishment should be permitted in some or all cases of murder in the first degree, procedures for amendment of the State Constitution which are relatively speedy, but still require time for reasonable reflection, are available to accomplish that end.

---

[2] Of the twenty-one other individuals sentenced to death between 1947 and the *Furman* decision, eighteen have had their sentences reduced because of the *Furman* decision, two received new trials and were found not guilty, and one committed suicide awaiting execution. See Cannon, First Degree Murder: The Post Conviction Experience in Massachusetts 15 (1974).

WILKINS, J. (concurring in the result). I agree that the defendant should be resentenced to imprisonment for life. I reach this conclusion on the sole ground that execution of the defendant for this crime would violate art. 26 of the Declaration of Rights of the Constitution of the Commonwealth.

The Commonwealth has not established that the imposition of the death penalty for this crime serves any purpose which cannot be achieved as well by a sentence of imprisonment for life. Therefore, the sentence of death constitutes "cruel or unusual punishment" in violation of art. 26 of the Declaration of Rights. Because of this conclusion, I need not address arguments resting on any other portion of the State Constitution or any arguments based on provisions in the Constitution of the United States.

In writing on this matter earlier, I said that "I believe that art. 26 requires, at the very least, that the Commonwealth not take a person's life unless that action serves a substantial purpose which cannot otherwise be achieved." *Commonwealth* v. *O'Neal,* 367 Mass. 440, 451 (Wilkins, J., concurring).[1] I then joined in an order of the court which in effect allowed further briefs to be filed on "the

---

[1] We in Massachusetts should be particularly conscious of the seriousness of the imposition, or at least the threat of the imposition, of the penalty of death. In the past 300 years, we have attracted inordinate attention, not all of it favorable, because of the existence of capital punishment. The irreversible finality of the execution of a criminal defendant can be both the source of universal regret, as events subsequent to the Salem witch trials plainly show, and the reason for intensified feelings concerning fairness in the administration of justice, as certain consequences of two murders in South Braintree in 1920 also plainly show. In addition, the existence of the penalty of death may be a deterrent not to crime but to conviction of murder in the first degree. See Judge Robert Sullivan's studied views of the reason for the 1893 acquittal of Lizzie Andrew Borden in Goodbye Lizzie Borden, p. 194 (1974). See also the foreword by Mr. Joseph N. Welch to The Untried Case by Mr. Herbert B. Ehrmann (2d ed. 1960) in which Mr. Welch discusses the cases of the Salem witches, Lizzie Borden and Nicola Sacco and Bartolomeo Vanzetti in relation to the death penalty.

question of the extent of the Commonwealth's interest in the imposition of the death penalty in rape-murder cases." *Id.* at 451.

Without reaching the question whether the death penalty may be imposed constitutionally in any circumstance, I conclude that the Commonwealth has not established that a sentence of death for a rape-murder, as opposed to life imprisonment, serves a substantial public purpose. If the brutality of taking a human life can be sustained at all in this Commonwealth, where no one has been executed since 1947, I believe that the Commonwealth must show a need for that death.

From the discussion in the Chief Justice's opinion it seems clear that if the death penalty, as opposed to life imprisonment, could be sustained in these circumstances deterrence would be the principal ground of support.[2] There are crimes as to which the deterrent effect of the threat of death may serve a purpose which cannot be achieved by the threat of life imprisonment. One example is murder in the course of the commission of a serious crime, such as kidnapping or holding a hostage, during which the criminal has ample time to reflect on the consequences of his taking of a life. Another example may be murder by a convicted murderer who is already subject to life imprisonment where the threat of the imposition of the death penalty may be the only available deterrent. There are no doubt other examples. The Commonwealth has not shown that murder in the course of rape or attempted rape is such a crime. One cannot infer with confidence from the nature of the crimes that the threat of the death penalty, as against life imprisonment, deters the commission of murder in the course of rape or attempted rape, and at this time there are no legislative findings or a report of a commission on which

---

[2] Retribution does have an important place in justification of the amount of punishment for the commission of a crime but cannot carry the burden alone of sustaining the imposition of a sentence of death, as opposed to life imprisonment, in these circumstances.

Commonwealth *v.* O'Neal.

the Commonwealth may rely in support of the death penalty.[3]

The application of constitutional principles is not immutable, and criminal penalties thought appropriate in 1780 are no longer accepted in our society. See *Weems* v. *United States,* 217 U. S. 349, 378 (1910); *Trop* v. *Dulles,* 356 U.S. 86, 100-101 (1958). In my view, our State Constitution tells us today that the State may not engage in the senseless killing of a murderer, even though he is by definition a person who has committed a senseless killing himself. Execution of such a criminal would be both "cruel" and "unusual" within the meaning of those words in art. 26 of the Declaration of Rights.

KAPLAN, J. (concurring in the result). I agree with Justice Wilkins that the result in the present case should be pitched on art. 26 of the Declaration of Rights, and I join in the substance of his opinion. I add a note, however, about a proposition which in Justice Wilkins's opinion is put more as a question than an assertion, but which emerges perhaps more definitely as an implication from the opinion of the Chief Justice. The proposition is this: If there are crimes (or perhaps homicidal crimes?) to which the prospect of punishment of death could be shown to serve as a stronger deterrent than life imprisonment (how much stronger?), then those crimes may be constitutionally amenable to that punishment. The "if"

---

[3] Indeed, for years, the threat of capital punishment may not have had any significant deterrent effect in this Commonwealth. Since the last execution for murder in this Commonwealth in 1947 and prior to the decision in *Furman* v. *Georgia,* 408 U. S. 238 (1972), numerous persons were convicted of murder in the first degree and sentenced to death, as was required in the absence of a contrary jury recommendation. However, none of these murderers has been executed. If we assume that a person is sufficiently reflective to note that his conduct may result in the commission of murder in the first degree, we may reasonably assume as well that that person will conclude that one way or another he will not suffer capital punishment because no one has been executed in Massachusetts since 1947.

clause is a highly speculative one. But supposing that the condition is satisfied, I note that the constitutional question would hardly be concluded. Among other matters, a court would then have to consider whether any legislative rule authorizing capital punishment, even a nominally "mandatory" rule, can be administered without caprice edged with discrimination against racial minorities and the poor, and whether, judged by evolved standards, the penalty itself is not so brutal and brutalizing as to be proscript. I mean to emphasize that "deterrence" is only one of the several factors that bear on the constitutional issue.

BRAUCHER, J. (concurring in the result). On the constitutional issues discussed in the opinions of my brothers, I find myself in agreement with the dissenting opinion of Justice Reardon. The latter opinion recognizes, however, that a substantial Federal and State constitutional question is presented. I therefore think we should first ascertain whether a construction of the statute is fairly possible by which the question may be avoided. See *First Natl. Bank* v. *Attorney Gen.* 362 Mass. 570, 594-597 (1972) (concurring opinion of Quirico, J.); *School Comm. of Springfield* v. *Board of Educ.* 366 Mass. 315, 334 (1974) (concurring opinion of Quirico, J.). In my opinion such a construction is not only fairly possible but plainly right. I therefore concur in the result reached by the court, though not in the reasons given for that result.

We recently reviewed the history of capital punishment in Massachusetts. See *Commonwealth* v. *Harrington*, 367 Mass. 13, 17-22 (1975). Before 1951 the death sentence was the only punishment for first degree murder. In 1951 our statute took substantially its present form, permitting the jury, as part of a verdict of guilty of murder in the first degree, to recommend that the sentence of death be not imposed. G. L. c. 265, § 2, as appearing in St. 1951, c. 203. The punishment was then to be imprisonment for life without parole. "No such

recommendation shall be made by a jury or recorded by the court if the murder was committed in connection with the commission of rape or an attempt to commit rape." Thus the punishment for first degree rape murder was to be the same as the punishment in any other first degree murder case in which no such recommendation was made. Until the decision in *Furman* v. *Georgia*, 408 U.S. 238 (1972), that punishment was death.

The *Furman* decision eliminated the death penalty in cases where no jury recommendation was made, if the jury were permitted to recommend that the sentence of death be not imposed. *Stewart* v. *Massachusetts*, 408 U.S. 845 (1972). Literally, the statute does not provide for any other penalty in such cases, but we held, "as matter of statutory construction," that "the only remaining relevant permissible penalty is imprisonment for life." *Commonwealth* v. *Cassesso*, 368 Mass. 124, 125 (1975). See *Commonwealth* v. *Gilday*, 367 Mass. 474, 485-486 (1975), and cases cited.

The possibility remained that we might hold, as to first degree murder committed after the *Furman* decision, that the provision for a jury recommendation was severable and invalid, and that the death sentence was mandatory. The trial judge in the *Harrington* case took that view, but we held that the only proper punishment was imprisonment for life. *Commonwealth* v. *Harrington*, *supra* at 21-22. We recognized that the trial judge's view "had support in decisions in other States and was not clearly foreclosed by decisions of this court or the Supreme Court of the United States." *Id.* at 23. But we had "no way of knowing how the Legislature would have reacted in 1951 if it had foreseen the situation which arose more than twenty years later." *Id.* at 21-22. We therefore adopted the "construction which operates in favor of life or liberty." *Id.* at 22, quoting *Commonwealth* v. *Martin*, 17 Mass. 359, 362 (1821).

Now we have before us a question expressly left open in the *Harrington* case. By implication a bare majority

of the Justices take the view that the provision for a jury recommendation is severable, and that what remains is a mandatory provision for the death penalty applicable only in cases of first degree rape murder. In all other cases where no jury recommendation is made, the statutory provision for the punishment of death, "as matter of statutory construction," means imprisonment for life, but in rape murder cases it means death. An isolated fragment of what was once an intelligible policy is thus preserved. This result is contrary to the clear statutory direction that rape murder cases be treated like other cases in which no jury recommendation is made. The majority Justices attribute to the Legislature an intention which is then held unconstitutional. Worse, the majority opinions cast serious doubts on the constitutionality of any death penalty which may be enacted hereafter. In order to prevent review by the Supreme Court of the United States, the case is made to turn on the Massachusetts Constitution rather than on the substantially similar provisions of the United States Constitution. Reliance is placed on a California decision which was promptly annulled by the people of California. Compare *People v. Anderson,* 6 Cal. 3d 628 (1972), cert. den. sub nom. *California* v. *Anderson,* 406 U.S. 958 (1972), with California Constitution, art. 1, § 27, adopted November 7, 1972.

So far as I can discover, no Legislature anywhere has ever established a system in which rape murder is punished by a mandatory death sentence and no other crime is subject to any death sentence. Certainly our Legislature did not vote for such a system in 1951. Recent proposals, vetoed by the Governor, to enact a mandatory death penalty have not embodied such a system. 1973 Senate Doc. No. 1976. 1974 House Doc. No. 5360, vetoed, 1974 House Doc. No. 5540. 1975 House Doc. No. 603, vetoed, 1975 House Doc. No. 5909. The logic of our decisions since the *Furman* case is opposed to our establishment of such a system. Indeed, the system is

now established only as a straw man, so that it can be destroyed. I would prefer to adopt the "construction which operates in favor of life or liberty."

The legislative history of the 1951 amendment confirms my view. The sponsors of the bill sought to eliminate capital punishment as a practical matter by the provision for a jury recommendation. They felt that abolition as matter of law was too drastic a change, and that a bill proposing total abolition would have a poor chance of passage. See Note, The Death Penalty in Massachusetts, 8 Suffolk U.L. Rev. 632, 635 (1974). After the bill passed the House, the provision precluding a jury recommendation in rape murder cases was added in the Senate by a vote of 20 to 19. The sponsor of the added provision was one of 15 who voted for it and then voted against the bill when it passed by a vote of 20 to 16. 1951 Senate Journal 608-612, 647-648. If the Legislature had foreseen the situation that has now arisen, it is extremely unlikely that it would have enacted the result this court now reaches. It is far more likely that it would have left in force the pre-1951 mandatory death penalty for all first degree murder, contrary to our decision in the *Harrington* case.

In sum, we should give great weight to a legislative judgment on what sentence is appropriate, but we are not bound to defer to a judgment the Legislature never made. When an intelligible legislative policy is tortured beyond recognition by constitutional developments, it may be the part of wisdom to await explicit new legislation, taking account of the new situation, rather than to preserve a remnant of the former policy. Cf. *Commonwealth* v. *Horton*, 365 Mass. 164, 171-172 (1974); *Commonwealth* v. *A Juvenile*, 368 Mass. 580, 598-599 (1975).

One final thought. To sentence a man today to be executed, if at all, at an indefinite time several years from now may well be to inflict a cruel and unusual punishment. No one desires that result, but in the present situation it seems as a practical matter to be the

almost inevitable result of a death sentence. For the
reasons I have already stated, I cannot bring myself to
attribute to the Legislature of 1951 an intention which
would produce that result in the case now before us.

REARDON, J., dissenting (with whom Quirico, J., joins).
I dissent. When on April 18, 1975, the four separate
opinions in *Commonwealth* v. *O'Neal*, 367 Mass. 440
(1975) (*O'Neal I*), were released I pointed out that con-
stitutional issues relative to the imposition of the death
penalty had been fully argued and should be met by this
court. Those issues were not addressed. Instead the first
of the opinions, that of the Chief Justice inviting further
briefs on a "narrow issue," a result in which three Associ-
ate Justices concurred, did not meet the constitutional
issues which had already been fully argued, save that
four Justices agreed that there should be no revision of
the verdict on the basis that discretion was lodged with
the jury to determine whether the death penalty should
be imposed. *O'Neal I*, at 443-445, 453. In reference to
the Eighth Amendment argument by counsel on the death
penalty as "cruel and unusual punishment," the first of
those opinions stated that "in deciding the case on this
basis [viz., whether the death penalty is violative of the
Eighth Amendment], we would simply enter the morass
in which many others have floundered before us," and
that "[i]n view of the rationale of this opinion, further
debate and controversy on the applicability of the con-
stitutional prohibition of cruel and unusual punishment
will serve no useful purpose at this time. We elect in-
stead to adopt an approach free from the abundant com-
mentary and exhaustive material surrounding the Eighth
Amendment route." *Id.* at 447. Having thus avoided
the real question before the court, we issued an order
that the parties reappear before us and argue to the point
whether the imposition of the death penalty for rape-
murder subserves a compelling State interest and "satisfies
the least restrictive means test." A majority of the court,

having themselves thus posed a new issue which the parties had neither raised nor argued in their briefs, then allowed the parties the limited period of thirty days within which to file briefs thereon. The case was advanced for reargument on that basis and the present opinion, *O'Neal II,* is the result.

1. *The Significance of North Carolina* v. *Fowler.*

In the interim *North Carolina* v. *Fowler,* 285 N.C. 90 (1974), cert. granted, 419 U.S. 963 (1974), raising identical Federal constitutional questions, has been argued before the Supreme Court of the United States and is set for reargument in the present term. 422 U.S. 1039 (1975). It is my belief that this court would do well, in view of the changed circumstances, to await that decision before launching on another excursion in this case. My view is strengthened in the light of the curious development that, while somewhat clouded, the first opinion at this juncture picks up the very questions which were refused consideration before and, in endeavoring to deal with them, engages in a large discussion indeed of the extensive literature on capital punishment. This is so notwithstanding that in *O'Neal I* there is recognition that the constitutional issues, State and Federal constitutional provisions, dictate identical results (fn. 5), a thought which is repeated in *O'Neal II* (fn. 1 to the opinion of the Chief Justice). A majority of the court are of opinion that in spite of the foregoing we should come down now with this opinion presumably since we are at liberty to assess the weighty questions before us under art. 26 of the Massachusetts Constitution. Passing for the moment the facts that the core of the Chief Justice's *O'Neal II* opinion rests on Federal precedent, I am led to believe that it does not contribute to the symmetry of the law to have this court go off on one tangent while the Supreme Court of the United States presently may go off on quite another. In short, with the question of Federal constitutionality presently pending before the United States Supreme Court in the *Fowler* case, we should defer to

that court on that phase of the question, as ultimately we must. If that court, considering only the question of Federal constitutionality, rejects capital punishment, that will be decisive of the *O'Neal* case. But if it upholds capital punishment the decision will not preclude Massachusetts or any other State from considering the question under its own Constitution. This is not "subservience to Federal precedent." Rather it is the exercise of simple common sense.

Nothing which I have said above is intended to be an expression of my personal views on the highly controversial subject of capital punishment, or on the present statutes of this Commonwealth on that subject. Indeed, a judge's personal philosophies on this subject cannot prevail over constitutional mandates or prohibitions, nor should they be permitted to affect constitutional judgments. I am quite familiar with the literature now adverted to in the main opinion. It is a sample of much more. But in evaluating the "evidence" contained therein we must be careful not to exceed the authority or abuse the power entrusted to us as a court. "That there may be an earnest conflict of serious opinion does not suffice to bring matters of legislative judgment within the range of judicial cognizance." *Commonwealth* v. *Leis*, 355 Mass. 189, 201 (1969) (Kirk, J., concurring). We should not permit a strong desire to cure the evils of the world to lead us into areas properly reserved, under our constitutional system of government, for other branches. In other words, our task here is to appraise the constitutional propriety of our statutes unhampered by any attempt to inject personal views which may warp the constitutional frame. Whether we judges, as individuals, like it or not, and how many times do we review legislation that we would dearly like to revise if we could, we are bound to remain within our proper confines and hew to an application of the several Constitutions which gives them a fair reading uninhibited by any sense of strain. That is at once our duty and our function.

2. *Due Process of Law.*

The foregoing is prefatory to the discussion which follows on aspects of due process and whether the death penalty constitutes "cruel and unusual punishment" in a constitutional sense. The guidelines set up in the Chief Justice's opinion in *O'Neal I* were in essence designed to discover whether the imposition of the death penalty for rape-murder could be sustained against a challenge under the due process clause of the Fourteenth Amendment to the United States Constitution. Three Justices concurred. However, at least two of them joined in the call for further briefs only because the question of the Commonwealth's interest in imposing capital punishment in rape-murder cases was deemed to be important under the cruel and unusual punishment clauses of the State and Federal Constitutions. As previously stated, I felt then and feel now that this question had been fully argued and that no further inquiry was necessary. I might add that having perused the second set of briefs and heard argument on the narrow issue on which *O'Neal I* invited arguments, I cannot say that anything of consequence has surfaced which was not presented to us originally. The *O'Neal I* net caught very small fish indeed.

In *O'Neal I*, I specifically reserved the right to state my views on the constitutional issues, and I address myself first to the thesis there presented by the Chief Justice, that the death penalty should be reviewed under the due process clause and that the statute imposing the penalty must fall unless the Commonwealth convinces this court that it serves a compelling State interest and satisfies the least restrictive means test. *O'Neal I*, at 450. I am convinced that this framework of analysis is both unwise and constitutionally unsound.

First, let us clarify the role played by the due process clause of the Fourteenth Amendment in a constitutional attack on the Commonwealth's right to impose the death penalty in this case. The Eighth Amendment is the appropriate avenue for consideration of this question but

standing by itself is not applicable to the States. Rather it is because the due process clause has been held to incorporate the proscription against cruel and unusual punishments contained in the Eighth Amendment that we refer to the latter amendment as binding on the States. *Robinson* v. *California,* 370 U.S. 660, 667 (1962). *Furman* v. *Georgia,* 408 U.S. 238, 241 (1972) (Douglas, J., concurring). Cf. *Louisiana ex rel. Francis* v. *Resweber,* 329 U.S. 459, 463 (1947). It becomes evident that the due process clause contains at least one substantive limitation on the severity of punishments which the State may impose and that is that they not be cruel and unusual. The question which the opinion of the Chief Justice in *O'Neal I* raises is whether there is a second, independent substantive limitation on punishments stemming from the due process clause. If so, it would follow that imposition of the death penalty might be held not violative of due process as cruel and unusual yet still be impermissible as failing to satisfy some other requirement of due process.

Putting to one side the question of arbitrary inflictions of punishments (see *In re Kemmler,* 136 U.S. 436, 448-449 [1890]), all indications are that the only substantive limitation on punishments contained in the Federal Constitution is the Eighth Amendment proscription against cruel and unusual punishments. For example, in *Weems* v. *United States,* 217 U.S. 349, 372-373 (1910), the Supreme Court explained the adoption of the Eighth Amendment as a necessary restriction on otherwise "unlimited" legislative power to inflict cruel punishments. Similarly, in referring to Federal legislation in *Bell* v. *United States,* 349 U.S. 81, 82 (1955), the Court noted: "The punishment appropriate for the diverse federal offenses is a matter for the discretion of Congress, subject only to constitutional limitations, more particularly the Eighth Amendment." Most recently, in *Furman* v. *Georgia, supra* at 263, Mr. Justice Brennan wrote that the prohibition against cruel and unusual punishments

was included in the Bill of Rights "precisely because the
legislature would otherwise have had the unfettered
power to prescribe punishments for crimes."

That the due process clause does not substantively limit
the severity of legislatively imposed punishments except in
so far as they are cruel and unusual is evident from *In re
Kemmler, supra* at 448-449.  In the *Kemmler* case, a
sentence of death by electrocution imposed by the State
of New York was challenged under the Fourteenth
Amendment.  As the law then stood, the Eighth Amend-
ment proscription against cruel and unusual punishments
had no application to the States, so the challenge was
based instead on the due process clause.  The Court
rejected the argument.  While conceding that due process
would forbid any arbitrary deprivation of life, liberty, or
property, the Court emphasized that the due process
clause "was not designed to interfere with the power of
the State to protect the lives, liberties and property of its
citizens, and to promote their health, peace, morals,
education and good order." *Id.* at 449.

As a matter of construction, it makes little sense to me
to bypass consideration of the Eighth Amendment
proscriptions in favor of the substantive due process
analysis relied on in today's opinion by the Chief Justice
in this case.  The Eighth Amendment was designed
specifically to circumscribe the power of the Legislatures
to impose criminal punishments.  Surely in interpreting
the already broad provisions of a Constitution we should
favor the specific over the general, especially here where
we are left only to ponder "the vague contours" of the
due process clause.  *Adkins* v. *Children's Hosp. of D.C.*
261 U.S. 525, 568 (1923) (Holmes, J., dissenting).

To pinpoint the defect of the *O'Neal I* approach, let
us consider a case arising under the Fourth Amendment
to the United States Constitution.  The police, having
probable cause, obtain an arrest warrant, and proceed to
enter a dwelling to effectuate an arrest.  All Fourth
Amendment requirements have been satisfied.  See

*Commonwealth* v. *Forde,* 367 Mass. 798, 804-806
(1975). However, it appears that the right of privacy is
considered a fundamental interest protected by the due
process clause. *Roe* v. *Wade,* 410 U.S. 113, 152-153
(1973). Is the result of *O'Neal I* that we must further
determine whether the arrest in a dwelling with a
warrant is the least restrictive means toward furtherance
of a compelling governmental end? For example, it may
well be that there is no particular emergency requiring
quick action by the police. The arrest may be safely
made at some later time outside the dwelling where the
invasion of privacy is minimized.

Furthermore, by characterizing life as a fundamental
interest, today's opinion by the Chief Justice not only
tests the death penalty against the general language of
the due process clause but also requires that the court
undertake "strict scrutiny" of the Commonwealth's justifi-
cation for the death penalty. Without traversing the
enormity of the decision to extinguish the life of a human
being, no matter what the crime, I am disturbed by the
implications of this requirement. I might first point out
that no cases are cited in the opinion in which the United
States Supreme Court or any other court has found life to
be a fundamental interest within the meaning of the due
process or equal protection clauses for the purpose of
exercising strict scrutiny over governmental decisions
affecting the interest in life. This characterization is
critical, for once it has been made, the consequence is
"the abandonment of the otherwise proper restraint on
judicial review." Developments in the Law — Equal
Protection, 82 Harv. L. Rev. 1065, 1131 (1969). In-
deed, the very dogmatic and mechanical nature of the
analysis occasioned by the mere dubbing of an interest as
fundamental has come under mounting criticism in recent
years. See *Dunn* v. *Blumstein,* 405 U.S. 330, 363-364
(1972) (Burger, C.J., dissenting); *San Antonio Independ-
ent Sch. Dist.* v. *Rodriguez,* 411 U.S. 1, 98-110 (1973)
(Marshall, J., dissenting); Goodpaster, The Constitution

and Fundamental Rights, 15 Ariz. L. Rev. 479, 498-499 (1973). Without doubt there is a basic, personal right to life secured by the United States and Massachusetts Constitutions; but recognition of this right does not require that the constitutionality of capital punishment for the crime of rape-murder be tested by the wooden and largely conclusory standards of "compelling state interest" and "least restrictive means."

A further difficulty with the two step analysis is discoverable in the following question: If "life" is a fundamental interest under the Constitution, why is not "liberty" also a fundamental interest? Certainly liberty is explicitly guaranteed by the Constitution to the same extent that life is explicitly guaranteed. See *San Antonio Independent Sch. Dist.* v. *Rodriguez, supra,* at 33-34. I agree with Mr. Justice Powell that " [t]he Due Process Clause admits of no distinction between the deprivation of 'life' and the deprivation of 'liberty.' " *Furman* v. *Georgia,* 408 U.S. 238, 447 (1972) (dissenting opinion). Perhaps the most telling illustration of this point lies in the two cases cited in the Chief Justice's opinion in *O'Neal I* for the proposition that life is a fundamental interest. 367 Mass. at 449. In both *Yick Wo* v. *Hopkins,* 118 U.S. 356, 370 (1886), and *Johnson* v. *Zerbst,* 304 U.S. 458, 462 (1938), the phrase employed by the Court referred to the fundamental rights of life *and liberty.* It may be argued of course that nothing is so fundamental as the right to life, that it is an interest on another plane altogether. But in my view the interest in not serving the remainder of one's life in prison is also enormously significant and could just as well be deemed "fundamental" for the purpose of triggering strict scrutiny. Yet are we then to invoke the less restrictive alternative test for a sentence of life imprisonment, and, if so, what about a twenty-year sentence, and so on down the line? Also, what if the government is never able to adduce convincing proof that any punishment is a necessary means to a compelling State interest — does it then

lack the power to punish at all? See *Furman* v. *Georgia, supra* at 396 (Burger, C.J., dissenting).

The problematic nature of the analysis proposed in *O'Neal I* demonstrates to me the dangers inherent in the court's apparent willingness to invite yet one more avenue of attack against the State's criminal laws under the banner of substantive due process. The constitutional theory proposed is most reminiscent of the era of *Lochner* v. *New York,* 198 U.S. 45 (1905), when statutes were thought to be violative of due process merely because they were considered unwise, that is, offensive to the judge's "personal preferences." Hand, The Bill of Rights 70 (1958). See *Lochner* v. *New York, supra* at 74-76 (Holmes, J., dissenting); *Adkins* v. *Children's Hosp. of D.C.* 261 U.S. 525, 568-570 (1923) (Holmes, J., dissenting); *Williamson* v. *Lee Optical of Okla. Inc.,* 348 U.S. 483, 488 (1955); *Ferguson* v. *Skrupa,* 372 U.S. 726, 730 (1963); *Dandridge* v. *Williams,* 397 U.S. 471, 484 (1970); *McGautha* v. *California,* 402 U.S. 183, 254-255 n.4 (1971) (Brennan, J., dissenting). As in the *Lochner* line of cases, judicial intervention here under the due process clause involves the Court in difficult factual determinations, in this case requiring the court to make an empirical judgment about the efficacy of the death penalty as compared to life sentences in serving the various goals of the criminal law. Yet this is a subject matter most appropriate for the careful study and open debate of the legislative body. As Mr. Justice Frankfurter wrote in another context, "In effect, we are asked to enter the domain of penology, and more particularly that tantalizing aspect of it, the proper apportionment of punishment. Whatever views may be entertained regarding severity of punishment, whether one believes in its efficacy or its futility, . . . these are peculiarly questions of legislative policy." *Gore* v. *United States,* 357 U.S. 386, 393 (1958).

Furthermore, the substantive due process analysis here actually goes well beyond the theory of judicial inter-

vention employed in the *Lochner* line of cases, for not even in those decisions did the Court purport to shift the burden of proof on the validity of statutes to the Legislature. See *Lochner* v. *New York, supra,* at 56-58; Ely, The Wages of Crying Wolf: A Comment on *Roe* v. *Wade,* 82 Yale L.J. 920, 940-941 (1973). Apparently the concept of judicial restraint in striking down State legislation is now to evaporate when the challenge can be fitted into the mold of substantive due process, and I fear we have not seen the last of this tantalizing device. We would do well to heed the words of Mr. Justice Holmes, who was the first to recognize that the *Lochner* approach was fraught with danger: "I have not yet adequately expressed the more than anxiety that I feel at the ever increasing scope given to the Fourteenth Amendment in cutting down what I believe to be the constitutional rights of the States. As the decisions now stand, I see hardly any limit but the sky to the invalidating of those rights if they happen to strike a majority of this Court as for any reason undesirable. I cannot believe that the Amendment was intended to give us *carte blanche* to embody our economic or moral beliefs in its prohibitions." *Baldwin* v. *Missouri,* 281 U.S. 586, 595 (1930) (dissenting opinion).

My concern for a proper measure of judicial restraint applies of course to our consideration of the Eighth Amendment challenge as well, and I shall return to this theme in that context. But I believe it is of particular moment in the area of the due process clause, providing a further reason, if one is needed, for questioning the analysis undertaken by the Chief Justice in this case and for avoiding its consequences.

It remains only to add on this point that while other language in our State Constitution is somewhat different (see arts. 10 and 12 of the Declaration of Rights) in its provisions for due process from those of the Federal Constitution, in *Pugliese* v. *Commonwealth,* 335 Mass. 471, 474-475 (1957), we construed the language to mean

practically the same thing as that of the due process clause of the Fourteenth Amendment. There were in essence no differences between the Federal and the State Constitutions. I reiterate that the substantive due process approach of *O'Neal II* to the State Constitution relies almost entirely on Federal precedents dealing with the Fourteenth Amendment. My references to due process apply equally to both Constitutions.

3. *Cruel and Unusual Punishments.*

I now turn to what seems to me to be the real issue in the case, namely, the proscription of cruel and unusual punishments in the Eighth Amendment to the United States Constitution, and of cruel or unusual punishments in art. 26 of the Declaration of Rights of the Constitution of the Commonwealth.

The defendant argues that both Constitutions strike down the death penalty as cruel and unusual or cruel or unusual. Initially I see no difficulty with the use of "and" and "or." While in *Gaynor's Case*, 217 Mass. 86, 89-90 (1914), we referred to the word "or" as a disjunctive particle rather than a conjunctive particle, we noted in the same case that "or" is often construed as "and."

While this court has never before focused specifically on the meaning of "or" in art. 26, it has used the phrase "cruel and unusual" interchangeably with "cruel or unusual." Compare *Sturtevant* v. *Commonwealth*, 158 Mass. 598, 600 (1893), *McDonald* v. *Commonwealth*, 173 Mass. 322, 328 (1899), and *Harding* v. *Commonwealth*, 283 Mass. 369, 374 (1933), with *Commonwealth* v. *Hitchings*, 5 Gray 482, 486 (1855), *Commonwealth* v. *Murphy*, 165 Mass. 66, 69 (1895), and *Commonwealth* v. *Novak*, 272 Mass. 113, 116 (1930). In addition, although Chief Justice Holmes initially reserved judgment on the question in *Storti* v. *Commonwealth*, 178 Mass. 549 (1901), he noted in dicta that "[n]ot only is the prohibition addressed to what in a proper sense may be called the punishment but, further,

the word 'unusual' must be construed with the word 'cruel' and cannot be taken so broadly as to prohibit every humane improvement not previously known in Massachusetts." *Id.* at 553. In the absence of historical evidence suggesting that the framers meant to proscribe every new form of punishment, regardless of its nature, or every form of punishment which might be characterized as "cruel" without regard to its ordinariness, I believe Chief Justice Holmes's reading of the two adjectives together is the only sensible construction of the phrase.

With reference to *People* v. *Anderson*, 6 Cal. 3d 628, cert. den. 406 U.S. 958 (1972), in which the California Supreme Court held the death penalty unconstitutional under a California provision prohibiting "cruel or unusual" punishment, that court emphasized the fact that the disjunctive established independent tests for cruelty and unusualness. I am not persuaded by this California precedent, particularly in light of the fact that the decision did not in fact turn on the independence of the standards, since the court found the death penalty to be *both* cruel and unusual.

Furthermore, there is nothing in our case law which suggests that art. 26 imposes a more rigorous limitation on punishments than the Eighth Amendment. Indeed, if anything, art. 26 imposes *less* restriction on possible punishments. The early cases read art. 26 as applying only to action by the courts and not inhibiting the Legislature. *Commonwealth* v. *Hitchings, supra. Sturtevant* v. *Commonwealth, supra.* While later we recognized that the Legislature is not unlimited by this provision, *McDonald* v. *Commonwealth, supra,* it has been accorded great deference even where penalties could fairly be characterized as Draconian or excessive, e.g., *Harding* v. *Commonwealth, supra, Commonwealth* v. *Moore*, 359 Mass. 509 (1971).

Thus I conclude that for purposes of this analysis art. 26 of the Massachusetts Declaration of Rights imposes a

standard no more restrictive than that expressed in the prohibition of "cruel and unusual" punishment in the Eighth Amendment.

The question whether the death penalty constitutes "cruel and unusual" punishment within the meaning of the Eighth Amendment was recently and exhaustively discussed in *Furman* v. *Georgia,* 408 U.S. 238 (1972). In a per curiam decision, the Court held that "the imposition and carrying out of the death penalty *in these cases* constitute cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments" (emphasis supplied). *Id.* at 239-240. Each of the five Justices supporting the decision, and each of the four dissenting from it, filed a separate opinion. Such elaborate scrutiny, however, while serving to air thoroughly the arguments on both sides of the issue, left unclear the precise extent of the decision, another reason for awaiting the outcome of the *Fowler* case. A reading of the per curiam decision and of the supporting opinions leads to the conclusion that *Furman* v. *Georgia* does not prohibit the imposition of the death penalty in cases where the Legislature has prescribed a mandatory death sentence for murder.

In the three cases involved in the *Furman* case, the determination whether the penalty should be death or a less severe punishment was left by the statute to the discretion of the judge or of the jury.

Mr. Justice Douglas, writing in support of the decision, focused almost exclusively on the discretionary aspect of the State statutes in question, concluding that "these discretionary statutes are unconstitutional in their operation. They are pregnant with discrimination and discrimination is an ingredient not compatible with the idea of equal protection of the laws that is implicit in the ban on 'cruel and unusual' punishments." *Id.* at 256-257.

Mr. Justice Stewart rested his conclusion that the death penalty in the cases before the Court was "cruel and

unusual" at least in part on the discretionary aspect of the sentencing procedure. "For, of all the people convicted of rapes and murders in 1967 and 1968, many just as reprehensible as these, the petitioners are among a capriciously selected random handful upon whom the sentence of death has in fact been imposed." *Id.* at 309-310.

Finally, Mr. Justice White pointed out that the "facial constitutionality of statutes requiring the imposition of the death penalty for first-degree murder, for more narrowly defined categories of murder, or for rape would present quite different issues under the Eighth Amendment than are posed by the cases before us," *id.* at 310, and concurred in the judgment of the Court because "the death penalty is exacted with great infrequency even for the most atrocious crimes and . . . there is no meaningful basis for distinguishing the few cases in which it is imposed from the many cases in which it is not." *Id.* at 313.

Thus, three of the five majority Justices expressly limited the decision to *discretionary* imposition of the death sentence by judge or jury, and refused to consider whether a mandatory death sentence would vitiate the Eighth Amendment.

Furthermore, as Mr. Justice Blackmun pointed out in his dissent, "The several concurring opinions acknowledge, as they must, that until today capital punishment was accepted and assumed as not unconstitutional *per se* under the Eighth Amendment or the Fourteenth Amendment. This is either the flat or the implicit holding of a unanimous Court in *Wilkerson* v. *Utah,* 99 U.S. 130, 134-135, in 1879; of a unanimous Court in *In re Kemmler,* 136 U.S. 436, 447, in 1890; of the Court in *Weems* v. *United States,* 217 U.S. 349, in 1910; of all those members of the Court, a majority, who addressed the issue in *Louisiana ex rel. Francis* v. *Resweber,* 329 U.S. 459, 463-464, 471-472, in 1947; of Mr. Chief Justice Warren, speaking for himself and three others (Justices Black,

Douglas, and Whittaker) in *Trop* v. *Dulles*, 356 U.S. 86, 99, in 1958; in the denial of certiorari in *Rudolph* v. *Alabama*, 375 U.S. 889, in 1963 (where, however, Justices Douglas, Brennan, and Goldberg would have heard argument with respect to the imposition of the ultimate penalty on a convicted rapist who had 'neither taken nor endangered human life'); and of Mr. Justice Black in *McGautha* v. *California*, 402 U.S. 183, 226, decided only last Term on May 3, 1971." *Id*. at 407-408.

General Laws c. 265, § 2, provides that the death penalty is mandatory for any person found guilty of murder in the first degree committed in connection with the commission of rape or attempted rape. Thus all those found guilty of this combination of crimes will be subjected to the same penalty.

The sheer infrequency of imposition of the death penalty, referred to by several of the opinions in the *Furman* case, will not be decreased. However, the essence of the complaint of infrequency was that it raised a presumption of arbitrariness in the imposition of the penalty. Where, as here, the Legislature has made a judgment that all found guilty of a particular class of crime must be punished by death, such objection cannot be raised.

Thus *Furman* v. *Georgia* does not decide the question before us in this case, and I turn now to consider whether the Eighth Amendment prohibits the imposition of a mandatory death sentence for murder committed in the course of a rape.

On purely historical grounds, there are strong arguments for finding that the death penalty is not "cruel and unusual" punishment within the meaning of the Eighth Amendment. As was noted by four Justices in *Trop* v. *Dulles*, 356 U.S. 86, 99 (1958), "[T]he death penalty has been employed throughout our history, and, in a day when it is still widely accepted, it cannot be said to violate the constitutional concept of cruelty." Evidence

internal to the Constitution such as the Eighth and Four-
teenth Amendment guaranties against deprivation of life
without due process suggests that the framers never
contemplated that the death penalty per se was a cruel
and unusual punishment. It seems without doubt that
the framers of the Eighth Amendment (and of the Massa-
chusetts Constitution as well) had as their principal inten-
tion the elimination of the tortures of the Stuart régime
in England. In all the elaborate literature dealing with
this subject, which has received extensive treatment in
*Furman* v. *Georgia, supra,* and *People* v. *Anderson,
supra,* there is no evidence on the drafting of our funda-
mental documents which discloses any intention to open
the way for the abolition of capital punishment. I do
not venture into a repetition of the basic sources of this
statement. The *Furman* and *Anderson* cases treat them
quite completely. Argument that capital punishment
was cruel and unusual punishment in the eyes of the
constitutional fathers cannot be supported.

As Mr. Justice Black noted in a separate opinion in
*McGautha* v. *California,* 402 U.S. 183, 226 (1971),
"The Eighth Amendment forbids 'cruel and unusual
punishments.' In my view, these words cannot be read
to outlaw capital punishment because that penalty was in
common use and authorized by law here and in the
countries from which our ancestors came at the time the
Amendment was adopted. It is inconceivable to me that
the framers intended to end capital punishment by the
Amendment. Although some people have urged that this
Court should amend the Constitution by interpretation to
keep it abreast of modern ideas, I have never believed
that lifetime judges in our system have any such legisla-
tive power."

Even if we move beyond purely historical considera-
tions, and recognize that clauses such as "cruel and
unusual" draw their meaning "from the evolving
standards of decency that mark the progress of a maturing
society," *Trop* v. *Dulles, supra* at 101, it is far from clear

what those standards of decency are, or that the mandatory imposition of the death penalty in a case such as this violates them. When such a standard is uprooted from its historical origins, and where there is little indication, either from the language itself or in the circumstances of its enactment, what the content of those words should be now, the temptation is great for a court simply to use a vague standard as a vehicle for its own moral values.

We must be ever reluctant to overturn a decision by the popular branch of the government to impose a particular punishment in the absence of strong evidence that the Legislature has overstepped the constitutional limit. As Mr. Chief Justice Burger said, dissenting in the *Furman* case, "There is no novelty in being called upon to interpret a constitutional provision that is less than self-defining, but, of all our fundamental guarantees, the ban on 'cruel and unusual punishments' is one of the most difficult to translate into judicially manageable terms. . . . [I]t is essential to our role as a court that we not seize upon the enigmatic character of the guarantee as an invitation to enact our personal predilections into law." *Furman* v. *Georgia, supra,* at 375-376.

It seems clear that one meaning which may be attributed to the phrase "cruel and unusual" is that no *illegal* punishments be imposed, i.e., none that is not authorized by statute. There is some evidence that "unusual" had no meaning except as "illegal" in this context, and that it was the unauthorized punishments of Titus Oates during the reign of James II which were in the framers' minds. There is, of course, no question in this case along this line since the Legislature has clearly authorized this punishment.

"Cruel and unusual" may be taken to mean that a punishment not be grossly disproportionate to the offense. Thus in *Weems* v. *United States,* 217 U.S. 349, 367 (1910), the Court interpreted the Eighth Amendment as requiring as "a precept of justice that punishment for crime should be graduated and proportioned to offense,"

and held that a punishment of a fine, plus twelve years in jail, involving wearing of chains, and deprivation of civil rights during that time, followed by perpetual disqualification from political rights, and subjection to surveillance, all for a crime of making false entries in public records, was unconstitutional. While adoption of this precept does not necessarily mean we on the other hand wholeheartedly indorse a hard eye-for-an-eye, or as here, life-for-a-life, morality, it is at least true that the death penalty is not grossly disproportionate to the crime of murder committed in the course of a rape.

It has also been said that a punishment must not be excessively painful, unnecessarily painful, or demeaning to human dignity. Presumably it is these considerations which lie behind our intuitive rejection of torture, burning at the stake, and drawing and quartering, as "cruel and unusual." Thus in *Louisiana ex rel. Francis* v. *Resweber*, 329 U.S. 459 (1947), the Court denied relief against a second execution after the first execution failed to cause the defendant's death presumably because of a mechanical difficulty. The Court noted, "There is no purpose to inflict unnecessary pain nor any unnecessary pain involved in the proposed execution." *Id.* at 464. It has been argued that the death penalty in this case is unnecessarily cruel because life imprisonment could achieve the same goals. This argument, however, requires not only that we refuse to allow retribution as a justifiable social purpose in punishment of murderers, but also that we deny that the death penalty has a greater deterrent effect. The evidence such as there is on this point appears inconclusive but we do not see that fact as enabling us to substitute our judgment on it for that of the Legislature.

Another factor which may be taken into account in assessing the meaning of "cruel and unusual" is whether there is external evidence that in fact a punishment does not meet contemporary standards of decency. Thus, in *Trop* v. *Dulles*, 356 U.S. at 102, in ruling that loss of

citizenship for desertion from the armed forces was cruel and unusual, the court noted that " [t]he civilized nations of the world are in virtual unanimity that statelessness is not to be imposed as punishment for crime." There is nothing even approaching virtual unanimity of opinion in opposition to the death penalty. While we may take judicial notice of the fact that the death penalty has not been carried out in Massachusetts since 1947, we may also take judicial notice of the fact that in 1968, at the general election, when presented with the question, "Shall the commonwealth of Massachusetts retain the death penalty for crime?" a substantial majority of those expressing an opinion voted in favor of retaining the death penalty.[1] While there are many reasons why such an advisory vote might not be taken as the definitive expression of opinion on this topic, it is at least sufficient to show that public opinion is deeply divided.

4. *Conclusion.*

In sum, it is my conclusion that the due process analysis contained in *O'Neal I* and *O'Neal II* is unsound and could be the genesis of great and unwarranted constitutional difficulty. It is further my conclusion that, notwithstanding the treatises for and against, mostly against, capital punishment cited in the Chief Justice's opinion, the death penalty is not cruel and unusual punishment in the constitutional sense. It is further my conclusion that this court is compelled by art. 30 of the Declaration of Rights of Massachusetts to remain away from the determination of questions which are legislative and not judicial. I conclude that the death penalty is not prohibited in this case by the Eighth Amendment or the Declaration of Rights. I would also conclude that the provision of G. L. c. 265, § 2, which mandates the death penalty for murder committed in connection with

---

[1] The total number of ballots cast was 2,348,005. Of these 1,159,348 voted, "Yes," 730,649 voted, "No," and 458,008 were blank. Election Statistics, Pub. Doc. No. 43, 1968, at 406.

the commission of rape or an attempt to commit rape is not unconstitutional, and that sentences imposed under that provision are valid. I reiterate that the dubious constitutional consequences of today's opinion by the Chief Justice could be avoided without prejudice to the Commonwealth were we to await the outcome of *North Carolina* v. *Fowler,* 285 N.C. 90, cert. granted, 419 U.S. 963 (1974), set for reargument 422 U.S. 1039 (1975).